GUNDZIK GUNDZIK HEEGER LLP
Aaron C. Gundzik (State Bar No. 132137)
Aaron.gundzik@gghllp.com
14011 Ventura Blvd, Suite 206E
Sherman Oaks, CA 91423
Telephone: 818.290.7461
Facsimile: 818.918.2316

ARMSTRONG TEASDALE LLP
Alec P. Harris (*pro hac vice*)
Kathleen Guilfoyle (*pro hac vice*)
4643 South Ulster Street, Suite 800
Denver, Colorado 80237
Telephone:   720.200.0676
Facsimile:   720.200.0679
aharris@atllp.com
kguilfoyle@atllp.com

Attorneys for Defendant Compass Mining, Inc.

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| VERIBI, LLC, a Nevada limited liability company,<br><br>Plaintiff,<br><br>v.<br><br>COMPASS MINING, INC., a Delaware corporation,<br><br>Defendant. | Case No.: 2:22-CV-04537-MEMF-JPR<br><br>Hon. Maame Ewusi-Mensah Frimpong<br><br>**DEFENDANT COMPASS MINING, INC.'S REPLY IN SUPPORT OF ITS MOTION TO COMPEL ARBITRATION**<br><br>Date: November 17, 2022<br>Time: 10:00 a.m.<br>Place: United States Courthouse, 350 West First Street, Los Angeles, CA, 90012, Courtroom 8B, 8th Floor |

## I. INTRODUCTION

Veribi concedes that "the claims at issue in this case would be encompassed by a valid and enforceable arbitration agreement ... [so] the issue here ... is whether a valid arbitration agreement exists." Veribi Opp. to Compass's Motion to Compel Arbitration ("Opp.") [ECF No. 24] at 5. Compass agrees and focuses its Reply accordingly.

A valid arbitration agreement between the parties clearly exists here. The evidence shows that Compass's Hosting Agreement ("Agreement") has included an arbitration provision since June 2021, and that Veribi agreed to that provision (1) through payment of invoices for the BitRiver Miners at issue, which state "By paying for this invoice and paying the security deposit, you are agreeing to the Compass Mining Hosting Terms and Conditions"; (2) through at least one online purchase via the Compass website, where Veribi's agent, Mr. Vanhara, was specifically required to scroll through and consent to the Agreement; and (3) through Veribi's ongoing use of and payment for hosing services, which continues through present day.

Veribi offers no credible evidence to the contrary. Instead, Veribi attempts to confuse the issues by pointing to select transactions before June 2021 and to Compass's Website Terms of Service. These arguments miss the mark. As explained in Compass's opening Motion, transactions made before Compass updated its Hosting Agreement to include an arbitration provision were brought within the scope of that provision when Veribi subsequently and repeatedly agreed to the updated Agreement through additional purchases and paid Compass for hosting services. As for Compass's Website Terms of Service, these terms, "govern … use of this [Compass] website," not provision of hosting services and mining hardware. Vanhara Decl. Exhibits [ECF No. 24-2], Ex. E, Terms of Service at 17. Stripped of these red-herrings, the Opposition boils down to wholly unsupported (and irresponsible) "doubts" and "suspicions" of Compass's sworn testimony and documentary support. Opp. at 2, 7; Vanhara Decl. [ECF No. 24-1] at ¶¶ 15–20. But

-1-

the evidence—and law—is clear: the Parties have an agreement to arbitrate covering this dispute. So the Court should "rigorously enforce" the agreement, *see Prasad v. Barclays Bank Delaware*, Case No. CV 19-8095 FMO (RAOx), 2020 WL 6083663, at *1 (C.D. Cal. July 29, 2020) (quoting *Samson v. NAMA Holdings, LLC*, 637 F.3d 915, 923 (9th Cir. 2010) and citing other authorities), and compel arbitration.[1]

## II.  ARGUMENT

### A.  Veribi Agreed to Arbitrate By Paying Compass's Invoices.

By paying Compass invoices for the BitRiver Miners, Veribi agreed to the Compass Hosting Agreement. *See* Heller Decl. [ECF No. 15-1] ¶¶ 12–14, 21–26. California law is clear that notices of terms and conditions in billing statements like the ones at issue here are sufficient to bind a party to arbitration—even if customers choose not to read them, or do not notice them. *Hart v. Charter Communications, Inc.*, 814 F. App'x 211 (9th Cir. 2020), is directly on point. In that case, the Ninth Circuit considered whether the plaintiff had agreed to an arbitration provision by receiving two billing statements containing a notice that the transactions would be governed by a subscriber agreement, which contained an arbitration provision. *Id.* at 213–14. Upholding the district court, the Ninth Circuit concluded, "Because there is no dispute Hart [plaintiff] received the relevant billing statements, Hart's continued acceptance of TWC's services constituted assent to the agreement," and that the plaintiff was thus "bound by the terms of the 2014 subscriber agreement, including the arbitration clause." *Id.* Importantly, the Ninth Circuit also concluded that the

---

[1] Because there is not a genuine dispute of material fact, the Court can and should grant the Motion without the evidentiary hearing Plaintiff requests. *See, e.g.*, *Holman v. Bath & Body Works, LLC*, Case No. 1:20-cv-01603-NONE-SAB, 2021 WL 5826468, at *17 (E.D. Cal. Dec. 8, 2021) (granting motion to compel arbitration without hearing because there was no dispute of fact, "even accepting Plaintiff's declaration at face value").

1  plaintiff only needed to have "inquiry notice," as opposed to actual notice of the
2  agreement. *Id.*

3  Similarly, in *Moran v. Charter Communications, Inc.*, SACV 20-
4  00303JVS(JDEx), 2020 WL 5833640, at *4 (C.D. Cal. June 11, 2020), this Court
5  concluded that billing statements' conspicuous notices of terms applicable to the
6  parties' relationship gave the plaintiff reasonable notice of the terms, and that
7  plaintiff's failure to read the arbitration provision contained in the terms was no
8  defense. *Id.*; *see also Lopez v. Cequel Commc'ns, LLC*, No. 2:20-cv-02242-TLN-
9  JDP, 2021 WL 5112982, at *4 (E.D. Cal. Nov. 3, 2021) (similar).

10  Here, as in *Hart* and *Moran*, it is undisputed that Veribi repeatedly received
11  invoices for the very hardware and services at issue in this dispute that notified
12  Veribi of the Hosting Agreement. The invoices for the BitRiver Miners issued to
13  Veribi on June 9, 2021, August 5, 2021, January 14, 2022, and January 26, 2022
14  each state: "By paying for this invoice and paying the security deposit, you are
15  agreeing to the Compass Mining Hosting Terms and Conditions. The Terms and
16  Conditions are available on request." *See* Heller Decl., Ex. A [ECF No. 15-2]
17  (reproducing invoices); *see also* Vanhara Decl. ¶¶ 11–12 & Ex. G (conceding receipt
18  of August 5, 2021 invoice including notice and attaching same).[2] At the time of the
19  August 5, 2021 invoice and at all times thereafter, the Hosting Agreement contained
20  an arbitration provision.[3] Heller Decl., Exs. D–H [ECF Nos. 15-5 – 15-9]; *see also*
21  Heller Supp. Decl. ¶ 6 (clarifying external rollout dates for versions of Agreement).[4]

---

[2] At various times, the Agreement has had slightly different names. *See* Heller Supp. Decl. ¶ 8. These names all referred to the Agreement. *Id.*

[3] Veribi's "suspicio[ns]" about the versions of the Hosting Agreement, Opp. at 7, are completely unfounded and contradicted by multiple sworn statements from Compass employees. *See* Heller Decl. ¶¶ 35–41; Heller Supp. Decl. ¶¶ 5–9; Gosker Decl. ¶ 5.

[4] For several versions of the Hosting Agreement, there was a lag between the internal implementation dates provided in Mr. Heller's August 10, 2022 declaration and the external rollout date on which the agreement became visible on the Compass

And the notice in these invoices was clear and conspicuous: The notice is in clear, dark colored font, offset from surrounding text, and in a streamlined two-page invoice, with just a handful of other notes. *See* Heller Decl., Ex. A. Thus, as in *Hart* and *Moran*, by paying these invoices and continuing to receive Compass's hosting services, Veribi agreed to the Hosting Agreement, including its clear arbitration provision, and is thus bound to arbitrate this dispute.

Mr. Vanhara's assertion that he "did not notice 'Note 4' at the bottom of the invoice referencing Terms and Conditions that were 'available upon request,'" and that he "had no awareness that the alleged Compass Mining Hosting Terms and Conditions had an arbitration clause," (Vanhara Decl. ¶ 12), changes nothing. *Hart* and *Moran* make plain that actual notice is not required—only inquiry notice—and thus that a customer's failure to review the relevant notice or its incorporated terms is irrelevant. *Hart*, 814 F. App'x at 213–14; *Moran*, 2020 WL 5833640, at *4.

Moreover, the facts in this case are *even stronger* than in *Moran* or *Hart*. Both of those cases dealt with ordinary consumers purchasing relatively inexpensive household services. *See Hart*, 814 F. App'x at 213 (residential internet services); *Moran*, 2020 WL 5833640, at *1 (cable television services). By contrast, here, the plaintiff is not a consumer at all—it is a *business entity* that purchased "over [] *$1.5 million dollars'* worth of miners and hosting services from Compass from May to August 2021." Vanhara Decl. ¶ 13 (emphasis added). And Veribi's agent, Mr. Vanhara, is a sophisticated business person who is "used to working directly with sales representatives in B2B [business-to-business] settings." *Id.* Surely, such a sophisticated purchaser should be expected to read a notice on a two-page invoice—

---

website. Mr. Heller has provided a supplemental declaration clarifying this issue and providing the external rollout date for all versions of the Agreement attached to his initial declaration. *See* Heller Supp. Decl. ¶¶ 5–6. This clarification does not change the conclusion that as early as July 30, 2021, and many times since, Veribi agreed to a version of the Hosting Agreement containing an arbitration provision.

and the agreement it references—before spending "over [] *$1.5 million dollars"* in a four-month period. *Id.*[5]

Finally, Veribi's cited caselaw is distinguishable from the present facts. *Long v. Provide Commerce, Inc.*, 245 Cal. App. 4th 855 (Cal. Ct. App. 2016), *Wilson v. Huuuge, Inc.*, 944 F.3d 1212 (9th Cir. 2019), and *Soliman v. Subway Franchisee Advertising Fund Trust, Ltd.*, 999 F.3d 828 (2nd Cir. 2021), all involved highly inconspicuous notices of terms and conditions. *Long* involved a website browsewrap agreement at the bottom of a website in text blending into the background. 245 Cal. App. 4th 866. *Wilson* involved terms of service for a mobile app that users were never required to acknowledge, and that required consumers to dig through the app's menu or purchase page to even be found. 944 F.3d at 1214–19. And *Soliman* concerned whether a consumer could be bound by an arbitration provision where the consumer saw a code on a print advertisement, texted the code, began receiving promotional messages, and then sued, where the arbitration provision in question was included in terms of service available at a URL also listed on the initial print advertisement. 999 F.3d at 830. The facts here are a far cry from these inconspicuous agreements. Here, Veribi received multiple short invoices stating prominently that the transactions were governed by the Compass Hosting Agreement and that by paying the invoices, Veribi was agreeing to those terms. In addition, and as discussed below, Veribi was required to scroll through that agreement in full and consent to it through online purchases. Thus, just as in *Moran*, Veribi's purported failure to read the notice and noticed terms is not a defense—all the more so because Veribi is not a consumer, it is a business entity that spent over $1.5 million dollars. 2020 WL 5833640, at *4.

---

[5] For the same reason, Mr. Vanhara's asserted belief that the *only* terms governing Veribi's purchases were those set forth on a single promotional page of the Compass website, *see* Vanhara Decl. ¶ 11 & Ex. F, is not correct, and should not be credited.

1    Similarly, *Norcia v. Samsung Telecommunications America, LLC*, 845 F.3d 1279 (9th Cir. 2017), and *C9 Ventures v. SVC-West, L.P.*, 202 Cal. App. 4th 1483 (Cal. Ct. App. 2012), are inapposite. *Norcia* held that the receipt for the completed, one-time consumer purchase of a cellphone, indicating that the consumer agreed to arbitrate, did not create an agreement to arbitrate because the consumer did *nothing* to indicate his assent. 845 F.3d at 1286. Veribi, however, received invoices (not receipts) for multiple transactions and paid them all. As the text of the invoices makes plain, these actions affirmatively demonstrate Veribi's assent to the Agreement. *See* Heller Decl., Ex. A ("By paying for this invoice and paying the security deposit, you are agreeing to the Compass Mining Hosting Terms and Conditions."). *C9 Ventures* is cited for the proposition that invoices are not in themselves contracts. *See* Opp. at 10. This point is irrelevant—Compass does not propose that the invoices are contracts. Rather, in line with the caselaw cited above, the invoices gave Veribi notice of the Agreement, to which Veribi agreed by paying the invoices.

In short, there is no genuine dispute of fact that Veribi received and paid multiple invoices for BitRiver Miners and related hosting services with conspicuous notices of the Hosting Agreement, which contains an arbitration provision. As a matter of law, by paying the invoices, Veribi affirmatively assented to the Agreement—and to arbitrate this dispute.

**B.     Veribi Agreed to Arbitration Through the Compass Website.**

Veribi also consented to the Hosting Agreement through the Compass website. Veribi offers no legal argument against the conclusion that Veribi could have agreed to the Hosting Agreement and the accompanying arbitration provision through the Compass website. *See* Opp. at 7 ("[T]he Court need not enter into a detailed examination whether Compass' alleged 'browserwrap', 'clickwrap' or 'scrollwrap' theories apply in this case."). Instead, Veribi attempts to create a dispute of fact as to whether or not Veribi did so here. These efforts fail.

Veribi offers no credible evidence to rebut the testimony of Mr. Heller, which demonstrates that Veribi completed a July 30, 2021 transaction through Compass's website, and that, during the transaction, Mr. Vanhara was required to scroll through and agree to the Hosting Agreement. Instead, Veribi merely argues that Mr. Vanhara "do[es] not recall" this occurring. Vanhara Decl. ¶ 17; Opp. at 4. But the Court need not rely on Mr. Vanhara's lack of recollection. The testimony and documents provided by Mr. Heller and Paul Gosker, Compass's Chief Technology Officer, makes plain that on July 30, 2021, Mr. Vanhara (acting for Veribi) completed an online purchase for miners on Compass's website. *See* Heller Decl. ¶¶ 30–34; Gosker Decl. ¶¶ 6–33. In order to complete Veribi's online purchase, Mr. Vanhara was required to scroll through the Compass Hosting Service Agreement, click: "ok, I agree," and then check a box affirming: "I have read and agree to the Compass Hosting Service Agreement." *See* Heller Decl. ¶¶ 32–34. This is not a "hypothetical" process. *See* Opp. at 4. Unlike Veribi's unsubstantiated suspicions and speculation, Compass used actual, archived code to capture images of the July 2021 website. *See* Gosker Decl. ¶¶ 24–33 (detailing Compass's process of rendering July 2021 website). Just because Veribi presents an inaccurate description of the process of completing an online transaction does not bar the court from ordering arbitration. *See West v. Uber Techs.*, Case No. 18-CV-3001-PSG-GJS, 2018 WL 5848903, at *5 (C.D. Cal. Sept. 5, 2018) (agreeing that the plaintiff's characterization of the registration process was "flatly wrong" and ordering arbitration).

Indeed, Veribi does not appear to even address the July 2021 online transaction at all, instead focusing on March 2021, when Compass had yet to add an arbitration provision to the Hosting Agreement. *See* Opp. at 3–4. This is a distraction. As Compass explained in its opening Motion, and as explained below, because the parties' relationship was ongoing (indeed, it continues today, *see* Heller Supp. Decl. ¶ 10–11), Veribi agreed to arbitrate *all* disputes concerning hosting services when it agreed to the Hosting Agreement online on July 30, 2021 (and

through subsequent transactions). *See* Motion at 7 (discussing *Bischoff v. DirecTV, Inc.*, 180 F. Supp. 2d 1097, 1103–05 (C.D. Cal. 2002)); *see also, e.g.*, Heller Decl., Ex. F, at 1 ("This Compass Hosting Service Agreement … contains the terms and conditions that govern your access to and use of the Hosting Service...."). Veribi offers absolutely no legal argument to the contrary.[6]

### C. The Arbitration Provision Veribi Agreed to as Early as July 2021 Governs All of Its Use of Hosting Services.

The Agreement between the Parties applies to all hosting services provided by Compass to Veribi. The Agreement clearly states that it "contains the terms and conditions that govern your access to and use of the Hosting Service." Heller Decl. Ex. F, at 1. Hosting Service is defined as follows: "Compass shall provide for the hosting of Customer Hardware at the Hosting Facility selected by Customer ('Hosting Service')." *Id.* § 1.1. The arbitration provision in turn applies to "any dispute between or among them or their subsidiaries, affiliates or related entities arising out of, relating to or in connection with this Agreement." *Id.* at § 13. The Agreement, including the agreement to arbitrate, covers the entirety of the Parties' relationship as it relates to hosting services.

The Court in *In re Verisign, Inc., Derivative Litigation*, 531 F. Supp. 2d 1173 (N.D. Cal. 2007), discussed the effect of such broad language. There, the parties entered into a separate engagement letter for KPMG's services each year. *Id.* at 1223. The 2005 engagement letter added an arbitration clause. The arbitration provision applied to "any dispute or claim arising out of or relating to the engagement between

---

[6] That the July 30, 2021 transaction did not involve BitRiver Miners is irrelevant. Through the transaction, Veribi agreed to the Hosting Agreement, which governs all provision of hosting services. *See* Heller Decl., Ex. F, at 1 ("This Compass Hosting Service Agreement … contains the terms and conditions that govern your access to and use of the Hosting Service...."). In any event, as explained above, Veribi also specifically agreed to the Hosting Agreement through invoices for BitRiver Miners.

the parties, the services provided thereunder, or any other services provided by or on behalf of KPMG." *Id.* The court rejected plaintiffs' argument that the arbitration provision did not apply to their claims because the events underlying their claims occurred before the parties executed the 2005 engagement letter. *Id.* at 1224. In particular, the court emphasized that the engagement letter covered disputes arising out of "any other services provided by or on behalf of KPMG." *Id.*; *see also DeVries v. Experian Info. Sols., Inc.*, Case No. 16-cv-02953-WHO, 2017 WL 733096, at *8 (N.D. Cal. Feb. 24, 2017) ("Courts have also consistently applied arbitration agreements retroactively where the agreements ... facially apply to disputes arising prior to the agreement.").

*Al-Thani v. Wells Fargo & Co.*, No. C 08–1745 CW, 2009 WL 55442, at *6 (N.D. Cal. Jan. 7, 2009), also provides a helpful analysis. There, the plaintiff argued that an agreement to arbitrate should not be given "retroactive" effect where she opened a brokerage account and only later agreed to arbitrate claims relating to her brokerage account. The Court disagreed, explaining "the Brokerage Account Agreement placed no retroactive obligation on Plaintiff. By signing the acknowledgment form, she explicitly agreed to be bound by the arbitration provision in the Brokerage Account Agreement, thereby undertaking a *prospective* obligation to arbitrate, rather than litigate, any claims relating to her existing account." *Id.*

Here, as in *Verisign* and *Al-Thani*, the Hosting Agreement and its arbitration provision, apply broadly to Veribi's use of Compass's hosting services. Veribi agreed to arbitrate *all* disputes concerning hosting services when it agreed to the Hosting Agreement online on July 30, 2021 (and through subsequent transactions)—including disputes arising from transactions that occurred before July 30, 2021.[7]

---

[7] Indeed, Veribi's use of hosting services continues to this day, so the most current version of the Hosting Agreement arguably applies. *See* Heller Supp. Decl. ¶¶ 10–11; Gosker Decl., Ex. C. Regardless, the arbitration provision across versions has not substantively changed since July 2021 and it clearly governs Veribi's claims at

D.    **The Compass Website Terms of Service Are a Red Herring.**

Veribi's discussion of Compass's Website Terms of Service is a distraction. The terms of service clearly state they only "govern [the] use of [Compass's] website." *See* Vanhara Decl., Ex. E, Compass Website Terms and Conditions. Thus, by their plain terms, they do not apply to the provision of hosting services, which is clearly governed by the Hosting Agreement. *See* Heller Decl., Ex. F, Hosting Agreement at 1 ("This Compass Hosting Service Agreement … contains the terms and conditions that govern your access to and use of the Hosting Service...."). By the same token, the Website Terms of Service do not and cannot "supersede" the Hosting Agreement, as Veribi suggests. *See* Opp. at 11. Finally, though Veribi fails to mention this fact, like the Website Terms of Service, the Hosting Agreement is also hosted on the Compass website. *See* Gosker Decl. ¶ 35 & Ex. C. In short, Compass's Website Terms of Service have no impact on the Hosting Agreement. That Agreement makes plain that this dispute should be compelled to arbitration.

## III.    CONCLUSION

For all the above reasons, Compass respectfully requests that the Court enter an order compelling arbitration of this dispute and dismiss this litigation.

Dated:  August 30, 2022                    GUNDZIK GUNDZIK HEEGER LLP

                                           By:   /s/ *Aaron C. Gundzik*
                                           ─────────────────────────────
                                           Attorneys for Defendant Compass Mining, Inc.

issue here. *See generally* Heller Decl., Exs. D–H; Gosker Decl., Ex. C.