# EXHIBIT C

**Compass Hosting Service Agreement**

August 5, 2022

This Compass Hosting Service Agreement (this "***Agreement***") contains the terms and conditions that govern your access to and use of the Hosting Service (as defined below) and is an agreement between Compass Mining Inc. ("***Compass***," "***we***," "***us***," or "***our***") and the customer identified on the signature page ("***Customer***," "***you***," or "***your***"). This Agreement takes effect when you sign this Agreement (the "***Effective Date***"). Customer represents to Compass that Customer is lawfully able to enter into contracts (e.g., Customer is not a minor). If Customer is entering into this Agreement for an entity, Customer represents to Compass that Customer has legal authority to bind that entity. Please see Section 14 for definitions of certain capitalized terms used in this Agreement.

## 1    HOSTING SERVICE

1.1    <u>Hosting Arrangement</u>. Compass shall provide for the hosting of Customer Hardware at an approved Hosting Facility ("***Hosting Service***"), which shall be initially provided at the Hosting Facility or Hosting Facilities referenced in the Service Order. As part of the Hosting Service, Compass shall provide for or arrange shelf and/or rack space, sufficient electrical capacity at the required voltage and wattage, provision of electricity, monitoring and services (according to section 3.2) of Customer Hardware to achieve the Service Level (i.e., standard fixes, basic repairs or Customer Hardware resets), and support from Compass Mining Concierge Team and Compass Mining Operations Team, as applicable. In addition to the other rights herein, Compass reserves the right to switch any Hosting Facility to another facility, as Compass deems reasonable under the circumstances. Compass reserves the right to provide the Hosting Service directly or through agents, vendors and third parties. Customer acknowledges and agrees that Compass may procure products, services and facilities from, and subcontract the provision of the Hosting Service to, third party providers and subcontractors, including, without limitation, any Hosting Provider.

1.2    <u>Service Level</u>. Compass shall use commercially reasonable efforts to make the Hosting Service available to Customer ninety five percent (95%) of the time in each monthly period (the "***Service Level***"), except in the event of maintenance of the Hosting Facility or its associated infrastructure, any Customer Hardware failure, or Force Majeure Events. Compass does not guarantee that the Hosting Service will not be interrupted by outages or shortages of power which are planned or unplanned and outside of Compass's control, and Compass will not be liable for the foregoing. Compass does not guarantee the supply of electricity during each season or peak hours of the day. There is a possibility of voluntary or involuntary downtime, curtailment by Compass, the Hosting Facility or the Hosting Facility's energy provider, or outages or shortages of power. Compass shall not be responsible for the consequences of such outages and such outages shall not be calculated in connection with the Service Level commitment, except as expressly stated herein. Notwithstanding the foregoing, Customer acknowledges that Compass and the Hosting Facility participate in various Demand Response / Load Resource Participation Programs ("***LRP Programs***"), and that the LRP Programs are designed to maintain the integrity of the local grid system and allow for cost savings that can be passed on to Compass' customers. Accordingly, the LRP Programs provide the local grid operator with the capability to shut off the power load serving Compass' customers in response to load situations.

1.3    <u>Service Order</u>. The Customer acknowledges and agrees that certain terms of the Hosting Service are outlined in the Service Order, which shall be deemed to be agreed by the Customer through the checkout process on the Compass website or through the duly executed copy of this Agreement and an accompanying Service Order by the authorized representative of each party.

## 2    CUSTOMER HARDWARE AND DELIVERY

2.1    <u>Delivery and Installation of Customer Hardware</u>. Any costs for the installation, mounting, and unmounting of Customer Hardware and all tariffs, taxes, shipping costs, or other expenses associated with shipping, importing, exporting, and transporting Customer Hardware to the Hosting Facility shall be reflected in the Service Order(s) attached or incorporated by reference, or at Compass' then standard rates as published at https://support.compassmining.io/hc/en-us/articles/5738823210781 (as the same may be amended or modified from time to time, the "***Fee Schedule***"). Compass or its Hosting Provider may inspect the

Customer Hardware for suitability of hosting and has full discretion to accept or reject any Customer Hardware.

2.2    Operation and Start Date.  Compass shall make commercially reasonable efforts to commence operation of Customer Hardware on the scheduled Hosting Service Commencement Date reflected in the Service Order; provided however, that Compass shall not be responsible for any delay in operation of Customer Hardware for any reason, including delay in receipt of Customer Hardware, Force Majeure Events, lack of available rack space, Hosting Facility delays, Hosting Facility electrical or network connectivity problems, or loss of power due to the Transmission/Distribution network.

2.3    Serial Numbers. If requested by Customer, Compass shall provide Customer with the serial number for each machine included in the Customer Hardware.

## 3    HOSTING FACILITY MAINTENANCE AND CUSTOMER HARDWARE REPAIRS

3.1    Facility Maintenance. Compass, its Hosting Providers and any operators of the Hosting Facility shall be entitled to perform maintenance and any actions as deemed necessary or desirable by Compass or its agents with respect to the Hosting Facility and to maintain the network. Customer acknowledges and agrees that performance of such maintenance may cause the network to be temporarily inaccessible and the Customer Hardware may experience temporary down-time or unavailability. Compass and its Hosting Providers shall use commercially reasonable efforts to conduct such Maintenance in a manner so as to avoid or minimize the unavailability of the Hosting Service. If a scheduled Maintenance is expected to interrupt the availability of Hosting Service, Compass may give Customer notice by email prior to conducting such Maintenance, identifying the estimated time and anticipated duration.

3.2    Hardware Maintenance and Repair. Compass, its Hosting Providers and the operators of the Hosting Facility shall be entitled to perform maintenance and any actions as deemed necessary or desirable with respect to Customer Hardware, pursuant to Compass' then current Fee Schedule. To the extent that simple repairs cannot be performed without passing costs for parts and labor onto the Customer, the Customer will be notified of an estimated cost and estimated timeline for Customer Hardware repairs to be completed. Compass will make reasonable efforts to repair Customer Hardware on-site, but may require Customer Hardware to be shipped to the manufacturer or a third-party for critical repairs. Compass reserves the right to undertake the most cost-efficient option for any repair. Customer Hardware sent to the manufacturer for repair may be fully covered under a standard manufacturer warranty, but shipping costs will be paid at the Customer's expense. If the Customer does not agree with repair options or costs or the Customer Hardware is otherwise deemed unrepairable by the third-party service provider or manufacturer, the Customer has the right to cancel this Agreement and have its Customer Hardware shipped to it and at its expense. If Customer does not respond to options for repair provided by Compass within fifteen (15) days, Compass reserves the right to cancel the Agreement. If the Agreement is cancelled pursuant to this section, Customer shall pay a termination fee equal to the total of the Hosting Service Fee owing for the remainder of the term of the applicable Service Order.

3.3    Relocation. Compass or Hosting Provider may, from time to time, relocate Customer Hardware within the Facility or to another facility upon prior written notice to Customer, provided that the site of relocation shall afford reasonably comparable environmental conditions for Customer Hardware. Should Compass or Hosting Provider need to relocate Customer Hardware to another Hosting Facility, Compass shall provide Customer ten (10) days' prior written notice and Customer will have five (5) days to approve, such approval not to be unreasonably withheld, delayed or conditioned. If Customer does not approve such relocation within the timeframe established, it shall be deemed acceptance of the relocation to another Hosting Facility. If Customer objects to such relocation during the 5-day period, the parties shall work together in good faith to resolve the objection as quickly as possible, which may include returning the Customer Hardware to Customer at Customer's expense and the Agreement will be deemed terminated with Customer owing the Termination Fee (as set forth below). If the Customer Hardware is relocated according to this Section, the cost of relocating the Customer Hardware shall be borne solely by Compass and/or the Hosting Facility provider.

3.4  <u>Emergency Relocation</u>. Notwithstanding Section 3.3, in the event of an emergency, as determined in Compass' or Hosting Facility's reasonable discretion, or other unforeseen circumstances, Compass and/or Hosting Facility may rearrange, remove, or relocate Customer Hardware without any liability to Compass. Notwithstanding the foregoing, in the case of emergency, Compass shall provide Customer, to the extent practicable, reasonable notice prior to rearranging, removing, or relocating the Customer Hardware.

## 4    HOSTING SERVICE FEE AND CUSTOMER RESPONSIBILITY

4.1  <u>Selection of Mining Pool</u>. Customer shall timely provide Compass the mining pool it seeks to join. Customer is at all times responsible for the selection of the mining pool and for monitoring pool performance and instructing Compass to make any changes to the mining pool Customer seeks to use.  Customer will comply with any process established by Compass for establishing addresses, changes to addresses, and changes to the allocation of hashpower which will include secondary verifications and multiple approvals. Customer will give Compass at least 2 Business Days' notice of any change in addresses or pool location. Customer shall pay a cost for labor, solely determined by Compass in good faith, for any excess changes of pools or addresses.

4.2  <u>Private Key and Wallet Security</u>. Customer shall at all times be responsible for maintaining software and all other telecommunications, Internet access and related equipment required to receive Customer's mining rewards. Customer is solely responsible for the security of Customer's private keys. Customer shall hold Compass harmless from breaches of user or access security with respect to any of Customer Hardware or the Hosting Facility. Compass does not provide any service to detect or identify any security breach of Customer Hardware or the Hosting Facility. Compass does not provide any tests employing tools and techniques intended to gain unauthorized access to Customer Hardware or Customer's personal property.

4.3  <u>Compass Account Security</u>.  Customer shall maintain the security of passwords for its Compass account and shall be solely responsible for the security thereof. Customer shall notify Compass if Customer suspects its Compass account has been hacked, stolen, accessed without authorization, or otherwise compromised. If Compass suspects any security violations have occurred related to Customer's Compass account, Compass may suspend access to Customer's account and Customer Hardware pending resolution.

4.4  <u>Maintenance</u>. Customer may be required to purchase from Compass other equipment, accessories, software, or hardware, such as power cords ("***Required Purchase***"), to ensure compliance with the technical and fire safety norms at the Hosting Facility.  Customer shall be notified about and approve of any Required Purchase in advance. If Customer does not approve of a Required Purchase within fifteen (15) days of being notified of such Required Purchase, Compass may either (i) proceed with most cost-effective option, and Customer agrees to pay any associated fees in connection therewith or (ii) terminate the Agreement and have the Customer Hardware returned to Customer at Customer's expense and the Agreement would be deemed terminated with Customer owing the Termination Fee (as set forth below).

4.5  <u>Return of Customer Hardware</u>. Upon the expiration or termination of this Agreement and Customer's payment in full of all amounts owed to Compass, Customer shall arrange for the return of the Customer Hardware at Customer's expense. All fees, taxes, duties, shipping and handling costs, and risk of loss or damage during the return process, including during shipping, shall be borne by Customer; and Compass may require that Customer remove the Customer Hardware from the country in which the Hosting Facility is located and take possession outside of such country (and Customer must remove the Customer Hardware from Canada, if the Hosting Facility is located within Canada). If Customer does not provide retrieval instructions within 15 days of termination or expiration of this Agreement, Compass shall have the right to (i) sell or retain possession of the Customer Hardware; (ii) reconfigure Customer Hardware and retain for Compass' use and redirect mining rewards to Compass' wallet, or (iii) remove and store at Customer's expense, all or any portion of Customer Hardware without any costs, obligation or liability by Compass.  Compass will not be responsible for any damage or operation deficiency of Customer Hardware and Compass will not repair or reimburse Customer in any form.

4.6  <u>Interference</u>. If at any time Customer Hardware causes unacceptable interference to other customers of Compass or Hosting Partner customers Provider or their equipment, Compass or Hosting Provider may

remove or relocate Customer Hardware inside the Hosting Facility at Customer's sole expense. Compass shall provide written notice to Customer of such relocation. If such relocation fails to cure such interference, Compass may terminate this Agreement without further obligation to Customer under this Agreement.

4.7     <u>Modification and/or Overclocking</u>. Customer shall notify and obtain prior written approval from Compass before any Customer Hardware containing modifications, alternations, firmware adjustments or overclocking ("***Modified Equipment***") that might cause such Customer Hardware's performance to deviate from the standard and/or factory specifications as delivered to the Hosting Facility.  If Compass and/or Hosting Provider determines that any Customer Hardware has been altered or modified without prior written approval ("***Non-Compliant Equipment***"), Compass and/or Hosting Facility reserves the right to immediately suspend Services to such Non-Compliant Equipment and/or invoice Customer for Compass and/or Hosting Facility incremental cost from such Non-Compliant Equipment, which calculation will be solely determined by Compass and/or Hosting Facility and will be final and immediately payable by Customer. Additionally, Customer will be subject to a Non-Compliant Equipment fee equal to 25% of the Hosting Service Fees, which will be applied to each month the Customer Hardware was deemed to be a Non-Compliant Equipment.

## 5     PAYMENT TERMS AND TAXES

5.1     <u>Hosting Service Fee</u>. Compass calculates and bills fees and charges monthly in advance. The parties agree that fees not disputed prior to the date of payment or due date shall be conclusively deemed accurate. If the Hosting Facility incurs Service Level downtime during a billing period, you will receive a prorated Service Level credit on your bill based on the amount of time the Hosting Facility was offline, subject to the limitations contained herein.  For example, in the unlikely scenario where the Hosting Facility is offline for more than 36 hours in a monthly 30-day monthly period that would exceed 5% Service Level downtime, and such applicable Service Level credit shall be applied to the Projected Hosting Service Fee within thirty (30) days of the close of the given month.

5.2     <u>Payment Terms</u>. Acceptable forms of payment include credit card, debit card, ACH, bank wire and cryptocurrency. Compass may, in its exclusive discretion, modify the acceptable forms of payment from time to time.  For credit card and debit card payments, Compass or its third party processors may keep your account information on file and set up recurring billings for Hosting Service Fee, unless Customer expressly opts out of the recurring billings. Payments of Projected Hosting Service Fees for the upcoming month will be automatically deducted from Customer's account. If Customer elects to pay with cryptocurrency, Compass will invoice Customer in U.S. Dollars for the Projected Hosting Service Fee. Customer shall deliver the designated cryptocurrency in the amount equal to the invoice due amount into the Compass's digital wallet by 5:00 p.m. (Central Standard Time) on or before the due date. The exchange rate shall be the last traded price for such cryptocurrency to U.S. Dollars exchange transaction at the time of payment. In the event any refund of payments made in cryptocurrency becomes due to Customer, the amount of such refund shall be calculated in U.S. Dollars without regard to any change in cryptocurrency valuation.

5.3     <u>Deposit</u>. Customer shall deliver to Compass, or Compass will deduct from Customer account if Customer does not opt out of the automatic bill payment, a deposit for the Projected Hosting Service Fee ("***Deposit***"). Such Deposit shall be included in the initial payment along with payment for any hardware that Customer purchases from Compass. If Customer fails to pay any Hosting Service Fee, Compass may use, apply or retain all or any portion of the Deposit for the payment of any amount due or to reimburse or compensate Compass for any liability, expenses, loss or damages which Compass may suffer or incur by reason thereof. If Compass uses or applies all or any portion of the Deposit, Customer shall within ten (10) days after written request thereof deposit money with Compass sufficient to restore the Deposit to the full amount required by this Agreement. Within thirty (30) days after the expiration or termination of this Agreement, unless Compass elects to apply Deposit to unpaid Hosting Service Fee, Compass will return the portion of the Deposit not used or applied. No part of the Deposit shall be considered to be held in trust, to bear interest or to be prepayment for any Hosting Service Fee to be paid by Customer under this Agreement.

5.4     <u>Payment Due Date</u>. Time is of the essence in the payment of each and every invoice. For any overdue invoices, Compass may (i) apply any Deposit; (ii) terminate the Hosting Service, (iii) reconfigure Customer Hardware and retain for Compass' use and redirect mining rewards to Compass' wallet; (iv) seize and dispose of or sell the Customer Hardware and use the proceeds to satisfy any amounts due; and/or (v) turn

off Customer Hardware, and/or disable Customer's access to accounts until all fees due to Compass are paid in full. If Compass elects to redirect mining rewards, Customer forfeits its rights to any cryptocurrency mining rewards resulting from the redirected hashpower that was used to satisfy Customer's obligations to Compass. Without limiting the foregoing, Compass reserves the right to charge a monthly late fee in the amount of twenty five dollars ($25.00) per unit of Customer Hardware until all payments owed to Compass are settled, in addition to Compass' rights to take possession of the Customer Hardware and redirect mining rewards to Compass' wallet until any overdue invoice and late fee are paid in full. Compass shall have all the rights and remedies of a secured party under the Uniform Commercial Code and other applicable laws with respect to all collateral in which it has a security interest, such rights and remedies being in addition to all of its other rights and remedies provided for herein. Compass may sell or cause to be sold any or all of such collateral, in one or more sales, at such prices and upon such terms as it may deem best, and for cash or on credit or for future delivery, without its assumption of any credit risk, and at a public or private sale as it may deem appropriate, including, without limitation, any sale of the Customer Hardware on the Compass Marketplace.  In addition to the foregoing, Compass reserves the right to charge a reconnection fee of twenty five dollars ($25.00) per unit of Customer Hardware in the event Customer fails to pay any applicable invoice.

5.5    Hosting Service Fee Adjustment.  Compass reserves the right to provide written notice to modify its rates upon an increase in any of Compass' or its Hosting Provider's operating costs, including without limitation, power rates, leasing rates, tax rates and/or increased regulatory compliance costs.


## 6    TERM, TERMINATION, MODIFICATION AND SUSPENSION

6.1    Term. The initial term shall be as stated in a Service Order attached or incorporated by reference (the "**Initial Term**") and upon expiration of the Initial Term the Agreement will renew automatically as contemplated in the Service Order (each a "**Renewal Term**", and together with the Initial Term, the "**Term**"). If no Initial Term is set forth in a Service Order, unless terminated sooner as provided in this Agreement, the Initial Term of the Hosting Services provided under this Agreement shall begin on the Commencement Date and expire three (3) years thereafter and upon expiration of the Initial term, this Agreement will renew automatically for successive one (1) year Renewal Terms, unless either party provides written notice to the other party of its desire to avoid the Renewal Term at least sixty (60) days in advance of the conclusion of the Initial Term or the then-current Renewal Term, as applicable.  Any amendment, modification or revision of the terms of this Agreement by Compass pursuant to Section 15.2, shall not otherwise modify the Term, which shall remain as stated in your Service Order.


6.2    Termination.

6.2.1    Compass may terminate this Agreement for cause immediately following written notice if You: (i) fail to make any payments due pursuant to this Agreement or any other agreement you have entered into with Compass; (ii) violate, or fail to perform or fulfill any covenant or provision of this Agreement, and such breach is not cured within thirty (30) days after notification from Us; (iii) enter into bankruptcy, financial failure or insolvency; or (iv) sell your assets or equity to, or merge with, another person, corporation or entity, unless such transaction is approved in writing in advance by Compass.

6.2.2    Compass may terminate this Agreement if the Hosting Facility for the Customer Hardware becomes unavailable for any reason; in such event, the termination shall be effective on the last day of the Hosting Facility's availability and Compass shall provide Customer notice of termination promptly after learning of such unavailability. In addition, Compass may terminate or suspend all or a portion of the Agreement if necessary to ensure it remains in compliance with applicable law, rules, regulations, administrative or judicial orders or decrees. By way of example only, and by no means a limitation, termination or suspension hereunder may occur if Customer, a Hosting Facility or any other third-party seller or provider becomes designated by OFAC as a Blocked Person or other Specially Designated National as the List may be updated from time to time or a Hosting Facility ceases or is unable to provide contracted services to Compass. Compass will use commercially reasonable efforts to notify Customer, which may be via email or via the Compass website, of such termination or suspension. The parties agree that they will have no liability whatsoever to the other for any damage, loss, expense or cost as a result of any such termination or suspension

6.2.3    Compass may terminate the Agreement for convenience by providing Customer with a 30-day written notice.

6.2.4    Notwithstanding anything to the contrary contained herein, Customer may only terminate the agreement if the Customer Hardware purchased by Customer from Compass has been fully paid and there are no outstanding payment plans or financings with Compass, Hosting Provider or any third-party seller and no amounts that remain outstanding pursuant to this Agreement.

6.3    <u>Effects of Termination</u>.

6.3.1    In the event Compass terminates or suspends this Agreement pursuant to Section 6.2.2, Customer hereby irrevocably appoints Compass as its lawful limited attorney-in-fact to: (a) negotiate a liquidation or sale of Customer Hardware given the circumstances of termination or suspension; (b) to execute, sign, and deliver any instruments or documents which may be required to effectuate and consummate the negotiated liquidation transaction; and (f) transfer the Customer Hardware into the name of a third party in connection with any negotiated liquidation transaction. Compass shall have the authority to act upon its appointment as Customer's limited attorney in fact by exercising Compass' commercially reasonable efforts and undertaking any transactions in good faith upon a termination or suspension hereunder. Compass' foregoing appointment as Customer's limited attorney in fact, and all of Compass' rights and powers, coupled with an interest, are irrevocable and shall survive and not be affected by the subsequent death, incapacity, disability, dissolution, termination or bankruptcy of Customer and will extend to Customer's successors, assigns and legal representatives.  Compass will use notify Customer, which may be via email or via the Compass website, of any transaction undertaken pursuant to this Section 6.3.1.

6.3.2    In addition to any effects pursuant to Section 6.3.1, upon termination or expiration of this Agreement, Customer agrees to immediately pay to Compass all amounts then owed including all amounts owed through the term of any applicable Service Order.  Compass will provide written notice of any funds owed. If Customer fails to make such payments within five (5) days, Compass shall have the right to (i) sell or retain possession of the Customer Hardware; (ii) reconfigure Customer Hardware and retain for Compass' use and redirect mining rewards to Compass' wallet, or (iii) remove and store at Customer's expense, all or any portion of Customer Hardware without any costs, obligation or liability by Compass. Customer acknowledges that the rights mentioned above may also be granted or otherwise assigned to any third-party seller and/or Hosting Partner, or may be otherwise assigned by Compass.  Any of the measures above can be used to recover Customer funds owed plus reasonable costs to facilitate the recovery of funds owed.  Compass, or any third-party seller and/or Hosting Partner, shall have all the rights and remedies of a secured party under the Uniform Commercial Code and other applicable laws with respect to all collateral in which it has a security interest, such rights and remedies being in addition to all of its other rights and remedies provided for herein. Compass may sell or cause to be sold any or all of such collateral, in one or more sales, at such prices and upon such terms as it may deem best, and for cash or on credit or for future delivery, without its assumption of any credit risk, and at a public or private sale as it may deem appropriate, including, without limitation, any sale of the Customer Hardware on the Compass Marketplace.  In addition, if Customer terminates this Agreement, Customer shall pay a termination fee equal to the total of the Hosting Fee owing for the remainder of the Term of the applicable Service Order(s) ("***Termination Fee***"), along with any outstanding amounts owed to Compass for financed Customer Hardware whether pursuant to this Agreement or a separate agreement with Compass.

## 7    SECURITY INTEREST

7.1    <u>Security Interest</u>. CUSTOMER HEREBY GRANTS COMPASS A FIRST PRIORITY SECURITY INTEREST IN ALL CUSTOMER HARDWARE AND ALL PROCEEDS FROM THE SALE OF SUCH CUSTOMER HARDWARE IN ORDER TO SECURE THE TIMELY PERFORMANCE OF THIS AGREEMENT AND CUSTOMER'S OBLIGATIONS FOR THE FINANCING OF SUCH CUSTOMER HARDWARE, IF APPLICABLE, INCLUDING TO SECURE THE PAYMENT OF ALL INVOICES, CHARGES AND COSTS, INCLUDING, WITHOUT LIMITATION, COMPASS' CONTRACTUAL OBLIGATIONS AND RESPONSIBILITIES FOR THE PURCHASE AND HOSTING OF THE CUSTOMER HARDWARE. FURTHERMORE, AND NOTWITHSTANDING ANYTHING TO THE CONTRARY HEREIN, THE PARTIES AGREE AND ACKNOWLEDGE THAT A COMPASS HOSTING PARTNER MAY ACQUIRE A SECURITY

INTEREST IN THE CUSTOMER HARDWARE, BY WHICH THE HOSTING PARTNER MAY PLACE A LIEN ON, AND OTHERWISE ENCUMBER, THE CUSTOMER HARDWARE. THE PARTIES ACKNOWLEDGE THAT THE CUSTOMER HARDWARE IS AND AT ALL TIMES SHALL BE, AND BE DEEMED TO BE, SEPARATE, IDENTIFIABLE AND MOVEABLE PROPERTY OF THE CUSTOMER THAT DOES NOT FORM A PART OF, OR CONSTITUTE A FIXTURE TO, ANY HOSTING FACILITY. CUSTOMER AGREES TO ASSIST COMPASS AND HOSTING PARTNER TO PERFECT ALL SECURITY INTERESTS GRANTED, INCLUDING, BUT NOT LIMITED TO, SIGNING ANY DOCUMENTS THAT COMPASS AND/OR THE FINANCING PARTY DEEM REASONABLY NECESSARY, INCLUDING THE FILING OF A UCC 1 FINANCING STATEMENT. COMPASS IS FREE TO ASSIGN ITS RIGHTS IN CONNECTION WITH THE SECURITY INTEREST.

7.2    <u>Power of Attorney</u>. CUSTOMER HEREBY IRREVOCABLY APPOINTS COMPASS AS ITS LAWFUL LIMITED ATTORNEY-IN-FACT TO GRANT SUCH SECURITY INTEREST TO ANY HOSTING FACILITY OR THIRD-PARTY AND TO SIGN CUSTOMER'S NAME ON ANY DOCUMENTS NECESSARY TO PERFECT OR CONTINUE THE PERFECTION OF THE SECURITY INTEREST GRANTED HEREIN.

## 8    REPRESENTATIONS AND WARRANTIES

8.1    <u>Authority and Capacity</u>. Each party represents, warrants, and covenants that (i) it has full legal capacity, right, power and authority to execute and perform its obligations under this Agreement, including, without limitation, the grant of the attorney-in-fact rights herein; and (ii) its performance of obligations hereunder will not violate any applicable laws or require the consent of any third party.

8.2    <u>Title to Customer Hardware and Receipt of Mining Rewards</u>.  Customer represents, warrants and covenants that (i) Customer has clear title, free and clear of all security interests or liens, to Customer Hardware (except those granted to Compass or Hosting Provider per this Agreement, or in a separate agreement where Compass is a party, or with Compass' written consent), including the legal right to use, operate and locate the Customer Hardware; and (ii) its receipt of Mining Rewards will not violate any applicable laws or require the consent of any third party.

8.3    <u>Accuracy of Customer Information</u>. Customer represents and warrants that: (i) the information Customer has provided for the purpose of establishing an account with Compass is true, accurate, current and complete; and (ii) Customer will maintain and promptly amend all information and material to keep it true, accurate, current and complete.  Customer will provide such further information and sign such additional documents, cause meetings to be held, and do and perform and cause to be done such further acts and things as may be reasonably necessary in order to allow Compass to conduct any know your customer or other similar obligations.

8.4    <u>FCPA; Anti-Bribery</u>. In carrying out its responsibilities hereunder, Customer represents that it shall comply with all applicable anti- bribery laws including, but not limited to, the U.S. Foreign Corrupt Practices Act, as revised ("**FCPA**"), and the Organization for Economic Cooperation and Development Anti-Bribery Convention, as implemented in the territory. Customer represents that it understands that the FCPA generally prohibits the promise, payment or giving of anything of value either directly or indirectly to any government official for the purpose of obtaining or retaining business or any improper advantage. For purposes of this Section 8.4, "government official" means any official, officer, representative, or employee of any non-U.S. government department, agency or instrumentality (including any government-owned or controlled commercial enterprise), or any official of a public international organization or political party or candidate for political office. Customer represents and warrants that, in the performance of this Agreement, (i) neither it nor any of its representatives are governmental employees or officials or candidates for political office and it will advise the other Party of any change in such representation; (ii) it  and its representatives have not and will not make, offer, or agree to offer anything of value to any government official, political party, or candidate for office; (iii) it will comply with all provisions of the FCPA and the regulations thereunder as amended from time to time; and (iv) it agrees to indemnify, defend, and hold Compass harmless for damages and expenses resulting from a violation of the foregoing by itself or its representatives.

8.5    <u>OFAC</u>. Pursuant to United States Presidential Executive Order 13224 ("**Executive Order**"), each Party may be required to ensure that it does not transact business with persons or entities determined to have committed, or to pose a risk of committing or supporting, terrorist acts and those identified on the list of Specially Designated Nationals and Blocked Persons ("**List**") generated by the Office of Foreign Assets Control ("**OFAC**") of the U.S. Department of the Treasury. The names or aliases of these persons or entities

("**Blocked Persons**") are updated from time to time. Customer certifies, represents and warrants that: (a) it is not acting, directly or indirectly, for or on behalf of any person, group, entity or nation named by any Executive Order of the United States Treasury Department as a terrorist, "Specially Designated National and Blocked Person" or any other banned or blocked person, entity, nation or transaction pursuant to any Law that is enforced or administered by the OFAC; and (b) it is not engaged in this transaction, directly or indirectly on behalf of, or instigating or facilitating this transaction, directly or indirectly on behalf of, any such person, group, entity or nation. Customer hereby agrees to defend, indemnify and hold Compass harmless from and against any and all claims, damages, losses, risks, liabilities and expenses (including attorney fees and costs) arising from or related to any breach of the foregoing certification. Compass shall have no liability to Customer whatsoever in the event OFAC adds Blocked Persons to the List and Compass must take action to not transact business with such Blocked Persons.

8.6    Compliance with Laws. Customer represents and warrants that: (i) Customer will not use the Hosting Service for the development, design, manufacture, production, stockpiling, or use of nuclear, chemical or biological weapons, weapons of mass destruction, or missiles, in a country listed in Country Groups D: 4 and D:3, as set forth in Supplement No. 1 to Part 740 of the United States Export Administration Regulations, (ii) Customer shall not provide administrative access to the Hosting Service to any person (including any natural person or government or private entity) that is located in or is a national of any embargoed or highly restricted country under United States export regulations, which include Cuba, Iran, and Sudan, and (iii) Customer is not on the United States Department of Treasury, Office of Foreign Asset Controls list of Specially Designated Nationals and Blocked Persons.

## 9    RISK FACTORS AND LIMITATIONS OF LIABILITY

9.1    Protocol Risk. Compass does not own or control the underlying software cryptographic protocols of networks which govern the operation of any cryptocurrency. Compass is not responsible for the operation of the underlying protocols, and makes no guarantees regarding their security, functionality, or availability.

9.2    Network and Information Security Risk. Customer acknowledges and agrees that the use of telecommunications and data communications networks and the Internet may not be secure and that connection to and transmission of data and information over the Internet and such facilities provide the opportunity for unauthorized access to wallets, computer systems, networks and all data stored herein. Information and data transmitted through the Internet or stored on any equipment through which Internet information is transmitted may not remain confidential and Compass does not make any representation or warranty regarding privacy, security, authenticity, and non-corruption or destruction of any such information. Compass does not warrant that the Hosting Service or Customer's use will be uninterrupted, error-free, or secure. Compass shall not be responsible for any adverse consequence or loss whatsoever to Customer's use of the Hosting Service or the Internet. Use of any information transmitted or obtained by Customer from Compass is at Customer's own risk. Compass is not responsible for the accuracy or quality of information obtained through its network, including as a result of failure of performance, error, omission, interruption, corruption, deletion, detect, delay in operation or transmission, computer virus, communication line failure, theft or destruction or unauthorized access to, alteration of, or use of information or facilities, or malfunctioning of websites. Compass is also not responsible for any consequences of security incidents or breaches, including the loss or corruption of data, the unauthorized disclosure of data, or the unavailability of data.

9.3    Operational Risk. Customer acknowledges and agrees that Hosting Facility operations are subject to various risks, including, but not limited to, risks related to Hosting Facility logistics, power supply, compliance with agreements, compliance with regulatory requirements, construction delays.  In addition, global supply chain issues have resulted in a variety of disruptions for manufacturers, retailers, and various other types of companies from the ability to source and obtain raw materials to delays in shipping and the availability of end user products. Ongoing labor shortages have created challenges for companies across industries, including the manufacturing and transportation industries, further exacerbating supply chain disruptions. As a result of these disruptions, Compass and/or the Hosting Facility may experience increased costs, inventory shortages, and temporary shutdowns. In addition to supply chain disruptions and labor shortages, Compass and/or the Hosting Facility may experience increased inflation in the costs of various goods and services, including the costs of power supply

8

9.4 <u>As-Is and No Warranty</u>. COMPASS MAKES NO WARRANTIES OR GUARANTEES RELATED TO THE AVAILABILITY OF HOSTING SERVICE OR THE OPERATING TEMPERATURE OF THE DATA CENTER. THE HOSTING SERVICE AND THE DATA CENTER PROVIDED BY COMPASS IS PROVIDED "AS IS" AND "AS AVAILABLE". COMPASS DOES NOT PROVIDE MECHANICAL COOLING OR BACKUP POWER AND THE DATA CENTER IS SUBJECT TO SWINGS IN LOCAL TEMPERATURE, WIND, HUMIDITY, ETC. COMPASS MAKES NO WARRANTY WHATSOEVER, INCLUDING ANY (I) WARRANTY OF MERCHANTABILITY; (II) WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE; (III) WARRANTY AGAINST INTERFERENCE; OR (IV) PRICE OR LIQUIDITY OF ANY DIGITAL ASSET. COMPASS DO NOT WARRANT THAT (A) THE HOSTING SERVICE SHALL BE AVAILABLE 24/7 OR FREE FROM MINOR INTERRUPTIONS; (B) THE HOSTING SERVICE SHALL MEET CUSTOMER'S REQUIREMENTS OTHER THAN AS SET OUT IN WRITTEN AGREEMENT BETWEEN THE PARTIES; OR (C) THE HOSTING SERVICE SHALL PROVIDE ANY FUNCTION NOT DESIGNATED IN WRITTEN AGREEMENT BETWEEN THE PARTIES.

9.5 <u>LIMITATION OF LIABILITY</u>. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS AGREEMENT, IN NO EVENT WILL COMPASS BE LIABLE TO CUSTOMER FOR (I) LOST PROFITS, LOSS OF BUSINESS OR LOST REVENUE TO CUSTOMER DURING OUTAGES, CUSTOMER HARDWARE FAILURES, FORCE MAJUERE EVENTS, OR SIMILAR OCCURRENCES; (II) ANY INTERNET FAILURE OR OUTAGE; (III) DAMAGES RESULTING FROM ANY ACTIONS OR INACTIONS OF CUSTOMER OR ANY THIRD PARTY; (IV) LOSS, INTERRUPTION OR USE OF DATA OR LOSS OF USE OF CUSTOMER HARDWARE OR ANY LOSS, DELETION, OR CORRUPTION OF CUSTOMER'S DATA OR FILES WHATSOEVER; (V) DAMAGES RESULTING FROM CUSTOMER HARDWARE OR ANY THIRD PARTY EQUIPMENT; (VI) ANY INTERRUPTION OR DEFECTS IN CUSTOMER HARDWARE FUNCTIONALITY; OR (VII) ANY CONSEQUENTIAL, INDIRECT  COST OF COVER, INCIDENTAL, SPECIAL, RELIANCE, EXEMPLARY OR PUNITIVE DAMAGES (IF APPLICABLE), EVEN IF ADVISED OF THE POSSIBILITY OF SUCH DAMAGES, EXCEPT TO THE EXTENT THAT ANY SUCH LOSS OR DAMAGES ARISES OUT OF SUCH PARTY'S GROSS NEGLIGENCE, BAD FAITH OR WILLFUL MISCONDUCT. THE LIMITATIONS SET FORTH HEREUNDER WILL APPLY TO ALL CLAIMS AND CAUSES OF ACTION, REGARDLESS OF WHETHER IN CONTRACT, TORT, STRICT LIABILITY OR OTHER THEORY. MOREOVER, IN NO EVENT SHALL THE AGGREGATE LIABILITY OF COMPASS TO CUSTOMER, FOR ALL LOSSES, COSTS, AND DAMAGES ARISING UNDER OR IN CONNECTION WITH THIS AGREEMENT EXCEED THE LESSER OF (I) ACTUAL DIRECT DAMAGES AND (II) THE TOTAL AMOUNT PAID BY CUSTOMER TO COMPASS UNDER THIS AGREEMENT DURING THE PRECEDING TWELVE-MONTH PERIOD. ALL REFERENCES TO PARTIES IN THIS PARAGRAPH SHALL INCLUDE THEIR RESPECTIVE SUBSIDIARIES, AFFILIATES DIRECTORS, OFFICERS, EMPLOYEES, CONTRACTORS, REPRESENTATIVES, ADVISORS AND AGENTS.

9.6 <u>Indemnification</u>.  Customer covenants and agrees to indemnify and hold harmless Compass and its officers, directors, stockholders, employees, agents, representatives, advisors and each of their successors and assigns (each a "**Compass Indemnified Party**") from any and all claims, demands, actions, suits, proceedings and Losses, costs, or expenses of any kind, including legal fees, incurred or suffered, directly or indirectly, by any Compass Indemnified Party whatsoever arising out of, attributable to or incidental to: (a) a breach of, or misstatement in, any one or more of the representations, warranties, obligations or covenants of Customer made in or pursuant to this Agreement; (b) the failure by Customer to pay any and all costs, taxes, customs, duties, tariffs, and the like arising from the transactions set forth in this the Agreement, (c) any act or omission of the Customer, (d) ownership, operation or use of the Customer Hardware, (e) Compass' violation of the Agreements with any financing party and/or Hosting Provider, (f) Customer's entering into this Agreement, (g) the negligence or intentional misconduct of Customer, or any of its agents, in connection with this Agreement, any Hardware Purchase Agreement or any agreement entered into by Compass in connection herewith or therewith, and (h) any conduct, activity, or action by Customer or any person or entity acting on its behalf, or at its request, which is unlawful or illegal under any state, federal or common law, or is violative of the rights of any individual or entity.

9.7 <u>Sole Remedy; Limitation on Timing of Actions</u>. Except as expressly set forth herein, Customer's sole remedy for performance or non-performance of the terms of this Agreement shall be a refund of any fees paid to Compass for the applicable service month. Unless applicable law requires a longer period, any

action against Compass in connection with this Agreement must be commenced within one year after the cause of the action has occurred.

9.8     Subrogation. Customer agrees to look exclusively to Customer's insurer to recover for injury or damage in the event of any loss or injury, including loss due to Customer fault, and releases and waives all right of recovery against Compass and its subsidiaries, affiliates directors, officers, employees, contractors, representatives, advisors and agents and will require a waiver of subrogation for the benefit of Compass and its subsidiaries, affiliates directors, officers, employees, contractors, representatives, advisors and agents.

## 10    CONFIDENTIALITY

10.1    General. Each party acknowledges that it and its employees or agents may, in the course of performing its responsibilities under this Agreement, be exposed to or acquire information which is Confidential Information of the other party. Neither party may use, disclose, or copy any Confidential Information except to the limited extent necessary to perform its obligations under this Agreement and will not disclose any Confidential Information to any person or entity other than to those persons who have a need to know the Confidential Information or as otherwise expressly permitted by this Agreement. Each party shall use the same measures that it uses to protect its own most confidential and proprietary information to protect the Confidential Information, but in no event less than commercially reasonable measures.

10.2    Return of Confidential Information. Upon termination or expiration of this Agreement, or at any other time at the request of the other party, each party shall return to the other party, or destroy and delete, as applicable, all Confidential Information and any copies thereof in its possession or control.

10.3    Privacy. Compass will comply with applicable privacy laws throughout the Term, and will take reasonable steps within Compass' power to ensure that Compass' employees, contractors, and other customers also comply with applicable privacy laws.

10.4    Compass Proprietary Information.  Except for the rights expressly granted herein, all rights, titles, and interests to any and all customer relationships, proprietary rights and intellectual property rights in Compass's data will remain with and be the exclusive property of Compass.

10.5    Government Inquiries and Investigations. Compass may cooperate with any government or legal investigation regarding any aspect of the Hosting Service, which may include producing identifying information of Customer.

## 11    INTELLECTUAL PROPERTY

11.1    Use of Trademarks. Neither party may use the other party's trademarks, service marks, trade names, copyrights, other intellectual property rights or other designations in any promotion, publication or press release without the prior written consent of the other party in each case, which consent shall not be unreasonably withheld.

## 12    INSURANCE AND RISK OF LOSS

12.1    Requirements. Customer will be solely responsible to ensure that the Customer Hardware, all Customer equipment and property are properly covered against all forms of damage. Customer shall obtain and maintain commercially reasonable insurance to protect against all risks of physical loss of or damage to the Customer Hardware or a Compass Protection Plan, if available. Compass shall be named as a loss payee on such insurance policy(ies) and Customer will provide a certificate of insurance confirming the same. If Customer does not insure the Customer Hardware or obtain any offered Compass Protection Plan, Customer will do so at Customer's sole risk and will indemnify, defend and hold harmless Compass and Hosting Partner from any failure to insure by Customer. If Compass elects to switch any Customer Hardware to a new Hosting Facility, Customer shall update its insurance policies to reflect any change in

the Hosting Provider without undue delay. Customer agrees to provide any assistance necessary to enable Compass to ensure its compliance with any agreement between Customer and Hosting Provider. Customer acknowledges and agrees that this section is a material component of this Agreement.

## 13    DISPUTES

13.1    <u>Mediation and Arbitration</u>. To the fullest extent permitted by law, the parties hereto agree to waive their rights to seek remedies in court, including but not limited to rights to a trial by jury. The parties agree that any dispute between or among them or their subsidiaries, affiliates or related entities arising out of, relating to or in connection with this Agreement, will be resolved in accordance with a confidential two-step dispute resolution procedure involving: (1) non-binding mediation, and (2) binding arbitration under the Federal Arbitration Act, 9 U.S.C. § 1, et. seq., or state law, whichever is applicable. Any such mediation or arbitration hereunder will be under the auspices of the American Arbitration Association ("**AAA**") pursuant to its then current Commercial Arbitration Rules and Mediation Procedures (the "**AAA Commercial Rules**"). No arbitration will be initiated or take place with respect to a given dispute if the parties have successfully achieved a mutually agreed to resolution of the dispute as a result of the step-one mediation. The arbitration (if the dispute is not resolved by mediation) will be conducted by a single AAA arbitrator, mutually selected by the parties, as provided for by the AAA Commercial Rules. The parties agree that the arbitrator will apply the substantive law of the State of Delaware to all state law claims and federal law to any federal law claims, that discovery will be conducted in accordance with the AAA Commercial Rules or as otherwise permitted by law as determined by the arbitrator. In accordance with the AAA Commercial Rules (a copy of which is available through AAA's website, www.adr.org), the arbitrator's award will consist of a written statement as to the disposition of each claim and the relief, if any, awarded on each claim. The parties understand that the right to appeal or to seek modification of any ruling or award by the arbitrator is limited under state and federal law. Any award rendered by the arbitrator will be final and binding, and judgment may be entered on it in any court of competent jurisdiction. Nothing contained herein will restrict either party from seeking temporary injunctive relief in a court of law. In the unlikely event the AAA refuses to accept jurisdiction over a dispute, the parties agree to submit to Judicial-Arbitration-Mediation Services ("**JAMS**") mediation and arbitration applying the JAMS equivalent of the AAA Commercial Rules. If AAA and JAMS refuse to accept jurisdiction, the parties may litigate in a court of competent jurisdiction pursuant to Section 15.5.

13.2    <u>Class Action Waiver</u>. Any dispute-resolution proceeding must be brought in the parties' individual capacities, and not as a plaintiff or class member in any purported class, collective, representative, multiple plaintiff, or similar proceeding ("**Class Action**").  The parties expressly waive any ability to maintain any Class Action in any forum. Unless the parties later otherwise agree, the arbitrator shall not have authority to combine or aggregate similar claims or conduct any Class Action nor make an award to any person or entity not a party to the arbitration. Any claim that all or part of this Class Action Waiver is unenforceable, unconscionable, void, or voidable may be determined only by a court of competent jurisdiction and not by an arbitrator. The parties understand that they would have had a right to litigate through a court, to have a judge or jury decide their case, and to be party to a class or representative action; however, the parties understand that they are foregoing these rights and electing to have any dispute decided individually, through arbitration.

## 14    DEFINITIONS

14.1    "**Business Day**" means any day other than Saturday, Sunday, or U.S. federal holiday.

14.2    "**Commencement Date**" means the date on which the Customer Hardware is scheduled to commence mining operations and as set forth in the Service Order.

14.3    "**Compass Mining Concierge Team**" means the Compass customer and technical service team, which shall be available to Customers to assist Customers with the Customer Hardware, Hosting Service and to achieve the Service Level.

14.4    "**Compass Mining Operations Team**" means the Compass customer and technical service team, which shall be available to Customers to assist Customers with the Customer Hardware, Hosting Service and to achieve the Service Level if the Compass Mining Concierge Team is unable to assist.

14.5    "***Compass Protection Plan***" means the damage waiver and protection plan offered by Compass, which Customer may elect to purchase, and if so, such terms and conditions will be attached to this Agreement as a separate addendum.

14.6    "***Confidential Information***" refers to confidential or proprietary information of a party including, without limitation, business plans, strategies, forecasts and projections and information about business structures, operations, systems, finances, assets, investments, investment strategies, software and other technology systems, and personnel, customers and suppliers. Confidential Information does not include if it (i) is known to the receiving party prior to receipt from the disclosing party directly or indirectly from a source other than one having an obligation of confidentiality to the disclosing party; (ii) becomes known (independently of disclosure by the disclosing party) to the receiving party directly or indirectly from a source other than one having an obligation of confidentiality to the disclosing party; (iii) becomes publicly known or otherwise ceases to be confidential, except through a breach of this Agreement by the receiving party; or (iv) is independently developed by the receiving party.

14.7    "***Customer Hardware***" refers to the cryptocurrency mining hardware belonging to the Customer and specified in the Service Order.

14.8    "***Force Majeure Event***" means a failure or delay in performance or any loss or damage due to a force majeure condition, which include, without limitation, acts of God, acts of civil or military authority, war, labor strike, embargo, terrorist act, fire, power failure, lightning, flood, earthquake, landslide, hurricane, typhoon, tsunami, volcanic eruption, water, electrical storms, load reduction and curtailment, inclement weather, health pandemic, epidemic or any law, order, regulation, civil disturbances, governmental regulations, orders, decrees, enforcement actions or other requirements, seizure or other action of any governing authority or agency, acts or omissions of a third-party owner or operator of a Hosting Facility, acts of public enemies, inability to secure replacement parts or materials, transportation facilities, or other causes beyond its reasonable control, whether or not similar to the foregoing, along with any planned service and maintenance needs.

14.9    "***Hosting Facility***" or "***Hosting Provider***" means a data center owned, leased, operated or reserved by Compass or Compass partners through the Site.

14.10   "***Losses***" means all damages, judgments, liabilities, losses and expenses, including without limitation, attorney's fees.

14.11   "***Mining Rewards***" means the digital asset, cryptocurrency, virtual currency, digital currency, or digital commodity (e.g., Bitcoin and Ethereum) produced by the proof-of-work cryptographic protocol of a computer network and generated by Customer's use of Customer Hardware.

14.12   "***Projected Hosting Service Fee***" means the total projected monthly fees for the upcoming month for use of the Service.

14.13   "***Service Order***" means the documentation that contains certain terms of the Hosting Service, including the Hosting Facility, the monthly hosting fee, as well as the estimated online date, which may be as specified in the order summary page if purchased on the Compass Site (https://compassmining.io/), or contained in a service order form attached hereto.

## 15    GENERAL PROVISIONS

15.1    <u>Captions and Section Headings</u>. Captions and section headings are for convenience only, are not a part of this Agreement and may not be used in construing it.

15.2    <u>Entire Agreement</u>.  This Agreement, including any Service Order(s), certificate, schedule, exhibit or other document delivered pursuant to its terms, constitutes the entire agreement between the parties and supersedes any other agreement, whether oral or written, with respect to the subject matter hereof. There are no verbal agreements, representations, warranties, undertakings or agreements between the parties. ANY WARRANTIES, TERMS, AND/OR CONDITIONS IN ANY PURCHASE AGREEMENTS, INVOICES, CREDIT APPLICATIONS, PURCHASE ORDERS, AND THE LIKE, OR ANY OTHER DOCUMENTS BETWEEN COMPASS AND CUSTOMER THAT CONFLICT WITH THE TERMS AND CONDITIONS SET FORTH HEREIN ARE GOVERNED BY THE TERMS HEREIN. Compass may at any time amend, modify or revise the terms of this Agreement by updating these terms and by providing notice to Customer of that

change via the Compass Website and/or by email and Customer's continued use of the Hosting Service reflects Customer's agreement to any modified, amended or revised terms in this Agreement.  Further, Compass may amend, modify or revise the Fee Schedule from time to time by making any changes to the linked location where the Fee Schedule resides.

15.3    <u>Further Assurances</u>. Customer will sign such further documents, cause meetings to be held, pass resolutions, exercise their votes and do and perform and cause to be done such further acts and things as may be reasonably necessary in order to give full effect to this Agreement and every provision hereof.

15.4    <u>Force Majeure</u>.  Neither party will be responsible nor in any way liable for any delays or failures in performance, except for payment of the Hosting Service Fee under this Agreement, arising out of or relating to a Force Majeure Event.  Compass nor its Hosting Providers shall be liable in any way for a Force Majeure Event. In the event of an occurrence of a Force Majeure Event, each party agrees to make a good faith effort to perform its obligations hereunder. Notwithstanding the foregoing, Compass has the right to terminate or suspend this Agreement in the event of a Force Majeure Event that prevents it from performing the Services hereunder or if Compass reasonably determines that providing the Services is impractical or will result in any failure to comply with applicable law, regulation, order or requirement.

15.5    <u>Governing Law</u>.  This Agreement and all claims arising out of or related to this Agreement are governed by and construed in accordance with the laws of the State of Delaware without giving effect to any choice or conflict of law provision or rule that would cause the application of the laws of any jurisdiction other than the State of Delaware. Only to the extent the dispute resolution provisions must be enforced, or in the event such provisions are not enforceable, or in connection with any necessary injunctive relief or to enforce an arbitration award, the jurisdiction and venue shall be exclusively within the State and Federal courts located within the State of Delaware.

15.6    <u>Injunctive Relief</u>. The parties acknowledge that the Confidentiality provision of this Agreement is reasonable in scope and duration and are not unduly restrictive. Customer further acknowledge that a breach of any of the confidentiality obligations in this Agreement will render irreparable harm to Compass, and that a remedy at law for breach of the Agreement is inadequate, and that Compass shall therefore be entitled to seek any and all equitable relief, including, but not limited to, temporary and permanent injunctive relief, without the necessity of posting a bond, and to any other remedy that may be available under any applicable law or agreement between the parties. Customer acknowledges and agrees that an award of damages to Compass does not preclude a court from ordering injunctive relief. Both damages and injunctive relief shall be proper modes of relief and are not to be considered as alternative remedies.

15.7    <u>No Assignment</u>. Customer will not assign or otherwise transfer this Agreement or any of the Customer's rights and obligations under this Agreement, without the prior written consent of Compass, which may be unreasonably withheld. Any assignment or transfer in violation of this Section 15.7 will be void. Compass may assign this Agreement without the Customer's consent (i) in connection with a merger, acquisition or sale of all or substantially all of our assets, or (ii) to any affiliate or as part of a corporate reorganization; and effective upon such assignment, the assignee is deemed substituted for Compass as a party to this Agreement and Compass is fully released from all of its obligations and duties to perform under this Agreement. Subject to the foregoing, this Agreement will be binding upon, and inure to the benefit of the parties and their respective permitted successors and assigns. The Customer may not merge this Agreement with any other agreements with Compass it may be party to.

15.8    <u>Consent to Electronic Business</u>. Because Compass operates online, it is necessary for Customer to consent to transact business with Compass online and electronically. As part of doing business with Compass, therefore, Customer consents to Compass giving Customer certain disclosures electronically, either via the Compass website, platform or to the email address you provide to us. By entering into this Agreement, Customer consents to receive electronically all documents, communications, notices, contracts, and agreements arising from or relating in any way to Customer's or Compass' rights, obligations, or services under this Agreement (each, a "***Disclosure***"). You will keep us informed of any change in your email or home address so that you can continue to receive all Disclosures in a timely fashion. If Customer's registered email address changes, you must notify us immediately of the change. Customer also agrees to

update your registered residence address and contact information on the Compass website if they change. Customer's decision to do business with Compass electronically is made completely voluntarily.

15.9    Notice. Notice is effective when received. All notices, requests, demands and other communications under this Agreement must be in writing and will be deemed duly given, unless otherwise expressly indicated to the contrary in this Agreement, (i) when personally delivered, (ii) upon receipt of a telephonic facsimile transmission with a confirmed telephonic transmission answer back, (iii) three (3) days after having been deposited in the United States mail, certified or registered, return receipt requested, postage prepaid, (iv) one (1) Business Day after having been dispatched by a nationally recognized overnight courier service, or (v) on the date transmitted if by email, addressed to the parties or their permitted assigns at such address or number as is given in writing by either party to the other.

15.10   Limited Agency. Customer agrees that Compass is hereby appointed Customer's limited agent and attorney-in-fact for the limited purposes of executing documentation, agreements, contracts and other documents, enforcing any such documentation or other rights at law or in equity as Compass may be requested in connection with the provision of the Hosting Services and/or performing its obligations hereunder or as otherwise required to enforce Compass' and/or Customer's rights with respect to any Hosting Facility or Hosting Provider, or any third-party interacting with such Hosting Facility or Hosting Provider, to protect, secure, obtain and/or retrieve any of the Customer Hardware, and to take all other reasonable actions as Compass may deem appropriate to effect the transactions contemplated by this Agreement. Due to certain events with any Hosting Facility or Hosting Provider, Compass may be required to act under this grant of limited agency. There is no fiduciary relationship between Compass and Customer. Notwithstanding anything to the contrary, there are no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or otherwise exist against Compass in its capacity as a limited agent.

15.11   Relationship of the Parties.  Except as expressly set forth herein, nothing else in this Agreement shall be deemed to create an agency, employment, partnership, fiduciary or joint venture relationship between the parties.  Except as expressly set forth herein, neither party has the power or authority as agent, employee or in any other capacity to represent, act for, bind or otherwise create or assume any obligation on behalf of the other party for any purpose whatsoever without the other's prior written consent. Compass may, however, disclose the obligations that Customer has undertaken in this Agreement to its Hosting Providers and Compass may make commitments or take actions on behalf of Customer to any Hosting Providers as further set forth in this Agreement.

15.12   Survival. Any provision of this Agreement, which, by its nature, would survive termination or expiration of this Agreement, will survive any such termination or expiration, including, without limitation, those provisions concerning Payment Terms (Section 5), Term, Termination, Modification and Suspension (Section 6), Security Interest (Section 7), Representations and Warranties (Section 8), Risk Factors and Limitation of Liability (Section 9), Confidentiality (Section 10), Insurance (Section 12), Disputes (Section 13) and these General Provisions (Section 15).

15.13   Counterparts; Electronic Execution. This Agreement may be executed in any manner of counterparts, all of which shall constitute in any number of counterparts, all of which shall constitute one and the same instrument, and any Party hereto may execute this Agreement, by signing and delivering one or more counterparts. Each Party agrees that this Agreement and any other documents to be delivered in connection herewith may be electronically signed or electronically agreed, and that any electronic signatures, acknowledgements or agreements are the same as handwritten signatures for the purposes of validity, enforceability, and admissibility.

14

**Compass Hardware Purchase Agreement**

August 5, 2022

This Compass Hardware Purchase Agreement (this "***Agreement***") contains the terms and conditions that govern your purchase of Mining Hardware (as defined below) through Compassmining.io (the "***Site***") and is an agreement between Compass Mining Inc. ("***Compass***," "***we***," "***us***," or "***our***") and the customer identified on the signature page ("***Customer***," "***you***," or "***your***"). This Agreement takes effect when you sign this Agreement (the "***Effective Date***"). Customer represents to Compass that Customer is lawfully able to enter into contracts (e.g., Customer is not a minor). If Customer is entering into this Agreement for an entity, Customer represents to Compass that Customer has legal authority to bind that entity. Please see Section 9 for definitions of certain capitalized terms used in this Agreement.

## 1    SALE OF HARDWARE

1.1    <u>Order of Hardware</u>.  The Customer shall place a Purchase Order through Site or through other methods accepted by Compass, and such Purchase Order shall constitute an irrevocable offer to purchase specific Hardware from either Compass or a third-party seller as such Hardware and third-party seller may be specified in the Purchase Order. Each Purchase Order shall be subject to the terms of this Agreement, which will be incorporated therein by reference. In the event of any conflict between the express terms of a Purchase Order and the terms of this Agreement, the express terms of the Purchase Order shall prevail with respect to that Purchase Order only.  The unit hashrate is estimated, the final unit hashrate may be changed according to production.

1.2    <u>Payment and Delivery</u>.  The Customer shall make payment in accordance with the terms specified in Section 2.  Compass shall also provide for the delivery to the Delivery Point.

1.3    <u>No Refunds, Returns or Exchanges</u>.  The Customer acknowledges and confirms that the Purchase Order is irrevocable and cannot be canceled by the Customer, and that the product(s) and Hardware ordered from Compass are not returnable, refundable or exchangeable. All sums paid by the Customer to Compass shall not be subject to any abatement, set-off, claim, counterclaim, adjustment, reduction, or defense for any reason. Down payment and payment of the total Purchase Price are not refundable, except only as expressly set forth in Section 6.1 hereof.  Refund requests based on shipment delay WILL NOT be accepted if delay is caused by the Manufacturer or any third party, including but not limited to the carrier, customs, or import brokers, nor shall it be liable for damages, whether direct, indirect, incidental, consequential, or otherwise, for any failure, delay or error in delivery of the Hardware for any reason whatsoever.  Further, unless otherwise agreed in writing by Compass, upon arranging for delivery of the Hardware to Customer directly or to a non-Compass hosting facility, such Hardware is ineligible for hosting at a Compass Hosting Facility or for any returns, refunds or exchanges.  Unless separately agreed to between the parties, Compass will not facilitate private sales of Hardware. Compass cannot and does not guarantee any proposed sales or transfers of Hardware, unless conducted directly through the Compass Marketplace, as Compass cannot otherwise ensure proper transfer of Hardware, ensure privately owned Hardware specifications and function, or other details of any proposed transaction.

1.4    <u>Discontinuance</u>. Customer agrees and acknowledges the availability of the Hardware is subject to the discretion of the applicable Manufacturer, and that said Manufacturer may modify or discontinue the Hardware at any time. Customer further agrees and acknowledges that Compass shall have no liability for any unavailability of, modifications to, or discontinuation of the Hardware by the applicable Manufacturer or Compass' supplier.

## 2    PAYMENT TERMS AND TAXES

2.1    <u>Purchase Price</u>.  The Purchase Price for the Hardware is as reflected in the Purchase Order.  Unless otherwise set forth in the Purchase Order, the Customer must pay the entire balance of the Purchase Price prior to the Hardware transferring title to the Customer. If the Manufacturer of the Hardware issues any coupons for the Hardware, Compass will pass coupons directly onto the Customer by applying any discount from the coupon to Purchase Price.  Unless otherwise set forth on a Purchase Order, the price for the Hardware excludes all packaging costs, transportation costs, freight, insurance, or any required

federal, state, or local sales or other taxes (except for taxes based on Compass' net income), duties, export or custom charges, VAT charges, brokerage, or other fees, for which Customer shall be fully responsible

2.2 <u>Payment</u>.  Customer shall pay the Purchase Price in U.S. Dollars (USD) or Tether coins (USDT) during the checkout process or according to the Purchase Order. Compass is under no obligation to reserve the Hardware for the Customer and will be able to freely sell the Hardware to another party until full payment is received according to the Purchase Order. If Compass is unable to deliver the Hardware for any reason, Compass will return the entire Purchase Price allocable to such Hardware not delivered to Customer. Under no circumstance will any billing error affect the Customer's obligation to pay the Purchase Price to Compass. Customer expressly authorizes to place and, upon payment in full of the Purchase Price, pay for such order. EXCEPT AS OTHERWISE PROVIDED FOR HEREIN, CUSTOMER ACKNOWLEDGES THAT COMPASS IS NOT REQUIRED TO PROVIDE A REFUND FOR ANY REASON. Customer hereby grants to Compass a purchase money security interest in all Hardware and all inventory of the Customer acquired from Compass or hereafter acquired from Compass, as well as the proceeds and product from the sale of such Hardware and inventory, as security for Customer's obligations hereunder until Compass receives payment of the full Purchase Price, plus any applicable fees.

## 3   DELIVERY

3.1 <u>Shipment</u>. Shipment shall be delivered duties paid ("***DDP***"). Customer agrees that the Delivery Date is an estimate only and may be changed. Compass will use commercially reasonable efforts to cause the Hardware to be shipped in accordance with the Delivery Dates. However, Compass shall not be liable for failure to ship the Hardware as estimated. Compass shall not be responsible for any delivery delay caused by the Customer, Manufacturer, or any third party, including but not limited to a carrier, supplier, customs or import brokers, nor shall it be liable for damages, whether direct, indirect, incidental, consequential, or otherwise, for any failure, delay or error in delivery of the Hardware for any reason whatsoever.

3.2 <u>Delivery Point</u>. Hardware purchased through Compass, if designated by Customer, may be delivered to a Hosting Facility operated by Compass for provision of Hosting Services, Compass' agents, or a third party for hosting. Customer may also have Hardware delivered to a different Delivery Point where Compass Hosting Services will not be used.  If Customer fails to provide Compass with the delivery place or the delivery place provided by Customer is a false address or does not exist, or the Purchaser rejects the Hardware, Customer shall bear any related costs incurred (including storage costs, warehousing charge and labor costs). Compass may issue the Customer a notice of self-pick-up and ask the Customer to pick up the Hardware itself. Compass shall be deemed to have completed the delivery obligation under this Agreement after two (2) Business Days following the issue of the self-pick-up notice. After thirty (30) days of the self-pick-up notice, Compass shall be entitled to dispose of the Hardware in any manner as it deems appropriate, including selling the same to another purchaser.  In the event that the Customer elects to take delivery of the Hardware or instructs that Compass deliver the Hardware to a non-Compass approved and operated facility, then the Customer may not employ the Compass Hosting Services for such Hardware. When Hardware is delivered to a non-Compass approved and operated facility, Customer shall be solely responsible for the installation, maintenance and operation of the Hardware and Compass has no further obligations whatsoever.

3.3 <u>Cancellation or Modification</u>. Customer may not modify, terminate, cancel, or otherwise alter Purchaser Orders, or defer shipment, after acceptance of the Purchase Order from Compass without the written consent of Compass, which may be withheld or conditioned in Compass' sole discretion.

## 4   TERM AND TERMINATION

4.1 <u>Term</u>. This Agreement will be effective upon the Customer's initiation of payment during the checkout process.

4.2 <u>Termination</u>.  This Agreement shall remain effective up to and until the delivery of the last Hardware and Customer's final payment of all fees, costs and expenses as required hereunder and shall terminate immediately, subject to the provisions surviving termination outlined in Section 10.9.

**5**    **REPRESENTATIONS AND WARRANTIES**

5.1    <u>Authority and Capacity</u>. Each party represents, warrants, and covenants that (i) it has full legal capacity, right, power and authority to execute and perform its obligations under this Agreement; and (ii) its performance of obligations hereunder will not violate any applicable laws or require the consent of any third party.

5.2    <u>Title to Hardware and Receipt of Mining Rewards</u>.  Customer represents, warrants and covenants that (i) Customer has clear title, free and clear of all security interests or liens (except those granted hereunder or in a separate agreement where Compass is a party), to Hardware, including the legal right to use, operate and locate the Hardware; and (ii) its receipt of Mining Rewards will not violate any applicable laws or require the consent of any third party.

5.3    <u>Accuracy of Customer Information</u>. Customer represents and warrants that: (i) the information Customer has provided for the purpose of establishing an account with Compass is true, accurate, current and complete; and (ii) Customer will maintain and promptly amend all information and material to keep it true, accurate, current and complete.  Customer will provide such further information and sign such additional documents, cause meetings to be held, and do and perform and cause to be done such further acts and things as may be reasonably necessary in order to allow Compass to conduct any know your customer or other similar obligations.

5.4    <u>Export Regulations</u>. Each Party acknowledges that certain Hardware purchased by Compass on behalf of Customer hereunder and any related documentation and other technology of the Manufacturer of the Hardware may be subject to applicable export control and sanction laws, regulations, and orders. Customer certifies, represents, and warrants that it is in compliance and shall take all necessary acts to remain in compliance with all applicable export and re-export control laws and regulations, including, without limitation, the Export Administration Regulations maintained by the U.S. Department of Commerce, trade and economic sanctions and regulations maintained by OFAC (defined below), and the International Traffic in Arms Regulations maintained by the U.S. Department of State. Customer hereby agrees to defend, indemnify and hold Compass harmless from and against any and all claims, damages, losses, risks, liabilities and expenses (including attorney's fees and costs) arising from or related to any breach of the foregoing certification.

5.5    <u>FCPA; Anti-Bribery</u>. In carrying out its responsibilities hereunder, each Party represents that it shall comply with all applicable anti- bribery laws including, but not limited to, the U.S. Foreign Corrupt Practices Act, as revised ("***FCPA***"), and the Organization for Economic Cooperation and Development Anti-Bribery Convention, as implemented in the territory. Each Party understands that the FCPA generally prohibits the promise, payment or giving of anything of value either directly or indirectly to any government official for the purpose of obtaining or retaining business or any improper advantage. For purposes of this Section 5.5, "government official" means any official, officer, representative, or employee of any non-U.S. government department, agency or instrumentality (including any government-owned or controlled commercial enterprise), or any official of a public international organization or political party or candidate for political office. Customer represents and warrants that (i) neither it nor any of its representatives are governmental employees or officials or candidates for political office and it will advise the other Party of any change in such representation; (ii) it and its representatives have not and will not make, offer, or agree to offer anything of value to any government official, political party, or candidate for office; (iii) it will comply with all provisions of the FCPA and the regulations thereunder as amended from time to time; and (iv) it agrees to indemnify, defend, and hold Compass harmless for damages and expenses resulting from a violation of the foregoing by itself or its representatives.

5.6    <u>OFAC</u>**.** Pursuant to United States Presidential Executive Order 13224 ("***Executive Order***"), each Party may be required to ensure that it does not transact business with persons or entities determined to have committed, or to pose a risk of committing or supporting, terrorist acts and those identified on the list of Specially Designated Nationals and Blocked Persons ("***List***") generated by the Office of Foreign Assets Control ("***OFAC***") of the U.S. Department of the Treasury. The names or aliases of these persons or entities ("***Blocked Persons***") are updated from time to time. Customer certifies, represents and warrants that: (a) it is not acting, directly or indirectly, for or on behalf of any person, group, entity or nation named by any Executive Order of the United States Treasury Department as a terrorist, "Specially Designated National

17

and Blocked Person" or any other banned or blocked person, entity, nation or transaction pursuant to any Law that is enforced or administered by the OFAC; and (b) it is not engaged in this transaction, directly or indirectly on behalf of, or instigating or facilitating this transaction, directly or indirectly on behalf of, any such person, group, entity or nation. Customer hereby agrees to defend, indemnify and hold Compass harmless from and against any and all claims, damages, losses, risks, liabilities and expenses (including attorney's fees and costs) arising from or related to any breach of the foregoing certification.

## 6    LIMITATIONS OF LIABILITY

6.1    <u>Force Majeure</u>. Compass shall not be liable for any loss, damage, delays, changes in shipment schedules or failure to deliver caused by any Force Majeure Event. The time for performance shall be extended for a period equivalent to the delay resulting from the Force Majeure Event. If, by reason of a Force Majeure Event, Compass' supply of Hardware shall be insufficient to meet all requirements, including its own, Compass shall have the right, at its option, and without liability, to allocate its available supply of Hardware among its present and future customers in such a manner as Compass deems equitable in its sole discretion so long as Customer receives a return of a portion of the Purchase Price for any Hardware not delivered as a result of such allocation. If by reason of a Force Majeure Event, the cost of Hardware exceeds the Purchase Price, Compass shall have the right, at its option, to terminate such transaction without liability to Customer; provided that upon termination pursuant to this Section 6.1, Compass shall refund the entire Purchase Price to Customer for any Hardware not delivered.  Notwithstanding the foregoing, Compass has the right to terminate or suspend this Agreement in the event of a Force Majeure Event that prevents it from performing hereunder or if Compass reasonably determines that performing is impractical or will result in any failure to comply with applicable law, regulation, order or requirement. Notwithstanding anything to the contrary, a Force Majeure Event shall not provide means to delay any payment of the Purchase Price by Customer.

6.2    <u>WARRANTY DISCLAIMER</u>. Compass represents and warrants that (i) the Hardware shall be in good working order when the same is delivered to the Customer and (ii) Compass and/or the seller of the Hardware is able to deliver good and marketable title to the Hardware to the Customer. Except as provided above, Customer hereby acknowledges and agrees that Compass makes no additional representation or warranty with respect to the condition of the Hardware. THE HARDWARE IS SOLD "AS IS" AND "WITH ALL FAULTS" AND COMPASS EXPRESSLY DISCLAIMS ALL AND MAKES NO WARRANTIES WITH RESPECT TO ANY HARDWARE AND/OR SERVICES PROVIDED HEREUNDER, EXCEPT AS PROVIDED HEREIN, INCLUDING, BUT NOT LIMITED TO, ANY IMPLIED OR OTHER WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, AND NON-INFRINGEMENT. CUSTOMER FURTHER ACKNOWLEDGES AND AGREES THAT THE HARDWARE DOES NOT GUARANTEE ANY CRYPTOCURRENCY MINING TIME, AND COMPASS SHALL NOT BE LIABLE TO CUSTOMER FOR ANY CRYPTOCURRENCY MINING TIME LOSS OR MINING REVENUE LOSS THAT MAY BE CAUSED BY DOWNTIME OF ANY PART OR COMPONENT OF THE HARDWARE. COMPASS DOES NOT WARRANT THAT THE HARDWARE WILL MEET THE CUSTOMER'S EXPECTATIONS OR REQUIREMENTS OR THAT THE HARDWARE WILL BE UNINTERRUPTED, OR ERROR FREE.

6.3    <u>Limitation of Liability.</u> NEITHER PARTY WILL HAVE ANY OBLIGATION OR LIABILITY (WHETHER IN CONTRACT, WARRANTY, TORT (INCLUDING NEGLIGENCE) FOR ANY INCIDENTAL, INDIRECT OR CONSEQUENTIAL, MULTIPLIED, PUNITIVE, SPECIAL, OR EXEMPLARY DAMAGES OR LOSS OF REVENUE, PROFIT, SAVINGS OR BUSINESS ARISING FROM OR OTHERWISE RELATED TO AGREEMENT, EVEN IF A PARTY OR ITS REPRESENTATIVES HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. THE PARTIES ACKNOWLEDGE THAT THESE EXCLUSIONS OF POTENTIAL DAMAGES WERE AN ESSENTIAL ELEMENT IN SETTING CONSIDERATION UNDER THIS AGREEMENT. NOTWITHSTANDING ANYTHING TO THE CONTRARY HEREIN, IN NO EVENT WILL COMPASS' AGGREGATE LIABILITY ARISING OUT OF THIS AGREEMENT EXCEED THE PAYMENTS ACTUALLY RECEIVED BY COMPASS FROM CUSTOMER FOR THE APPLICABLE HARDWARE FROM, OR IN RELATION TO, WHICH THE LIABILITY AROSE.

6.4    <u>Inspection and Returns</u>. The Hardware may be covered under warranty by the Manufacturer. The Customer shall return or undergo the warranty process with the Manufacturer at Customer's sole expense, and follow such Manufacturer's return/replacement/repair policy with respect to any such defective Hardware. Customer acknowledges and agrees that, in the event Customer seeks any type of refund, replacement, and/or repair, Customer shall seek such refund, replacement, and/or repair directly from the

Manufacturer. Compass shall not be under any obligation to replace/return the defective Hardware or deal with Manufacturer with respect to any such defective Hardware.

6.5    <u>Indemnification by Compass</u>. Compass covenants and agrees to indemnify and hold harmless Customer from any and all costs, expenses, losses, damages and liabilities incurred or suffered, directly or indirectly, by Customer (including, without limitation, reasonable legal fees and costs) resulting from any third party claim alleging a breach of, or misstatement in, any one or more of the representations and warranties of Compass made in or pursuant to this Agreement.

6.6    <u>Indemnification by Customer</u>. Customer covenants and agrees to indemnify and hold harmless Compass and its officers, directors, stockholders, employees, agents, representatives, advisors and each of their successors and assigns (each a "**Compass Indemnified Party**") from any and all damages, suits, claims, judgments, liabilities, losses, fees, costs, or expenses of any kind, including legal fees, incurred or suffered, directly or indirectly, by any Compass Indemnified Party whatsoever arising out of, attributable to or incidental to: (a) a breach of, or misstatement in, any one or more of the representations, warranties, obligations or covenants of Customer made in or pursuant to this Agreement; (b) the failure by Customer to pay any and all costs, taxes, customs, duties, tariffs, and the like arising from the transactions set forth in this the Agreement, (c) any act or omission of the Customer, (d) ownership, operation or use of the Hardware, (e) Compass' violation of the Agreements with the financing party and/or hosting facility, (f) Customer's entering into this Agreement, (g) the negligence or intentional misconduct of Customer, or any of its agents, in connection with this Agreement, the Hosting Services Agreement or any agreement entered into by Compass in connection herewith or therewith, and (h) any conduct, activity, or action by Customer or any person or entity acting on its behalf, or at its request, which is unlawful or illegal under any state, federal or common law, or is violative of the rights of any individual or entity.

# 7    CONFIDENTIALITY

7.1    <u>General</u>. Each party acknowledges that it and its employees or agents may, in the course of performing its responsibilities under this Agreement, be exposed to or acquire information which is Confidential Information of the other party. Neither party may use, disclose, or copy any Confidential Information except to the limited extent necessary to perform its obligations under this Agreement and will not disclose any Confidential Information to any person or entity other than to those persons who have a need to know the Confidential Information or as otherwise expressly permitted by this Agreement. Each party shall use the same measures that it uses to protect its own most confidential and proprietary information to protect the Confidential Information, but in no event less than commercially reasonable measures.

7.2    <u>Return of Confidential Information</u>. Upon termination or expiration of this Agreement, or at any other time at the request of the other party, each party shall return to the other party, or destroy and delete, as applicable, all Confidential Information and any copies thereof in its possession or control.

7.3    <u>Privacy</u>. Compass warrants and represents that, Compass shall comply with all applicable privacy laws throughout the Term, and will take all reasonable steps within Compass' power to ensure that Compass' employees, contractors and other customers comply with all applicable privacy laws.

7.4    <u>Compass Proprietary Information</u>.  Except for the rights expressly granted herein, all rights, titles, and interests to any and all customer relationships, proprietary rights and intellectual property rights in Compass' data will remain with and be the exclusive property of Compass.

7.5    <u>Government Inquiries and Investigations</u>. Compass may cooperate with any government or legal investigation regarding any aspect of the Hardware purchased herein or any Hosting Services provided to Customer, which may include producing identifying information of Customer.

# 8    DISPUTES

8.1    <u>Mediation and Binding Arbitration</u>. To the fullest extent permitted by law, the parties hereto agree to waive their rights to seek remedies in court, including but not limited to rights to a trial by jury. The parties agree that any dispute between or among them or their subsidiaries, affiliates or related entities arising out of, relating to or in connection with this Agreement, will be resolved in accordance with a confidential two-step

dispute resolution procedure involving: (1) non-binding mediation, and (2) binding arbitration under the Federal Arbitration Act, 9 U.S.C. § 1, et. seq., or state law, whichever is applicable. Any such mediation or arbitration hereunder will be under the auspices of the American Arbitration Association ("**AAA**") pursuant to its then current Commercial Arbitration Rules and Mediation Procedures (the "**AAA Commercial Rules**"). No arbitration will be initiated or take place with respect to a given dispute if the parties have successfully achieved a mutually agreed to resolution of the dispute as a result of the step-one mediation. The arbitration (if the dispute is not resolved by mediation) will be conducted by a single AAA arbitrator, mutually selected by the parties, as provided for by the AAA Commercial Rules. The parties agree that the arbitrator will apply the substantive law of the State of Delaware to all state law claims and federal law to any federal law claims, that discovery will be conducted in accordance with the AAA Commercial Rules or as otherwise permitted by law as determined by the arbitrator. In accordance with the AAA Commercial Rules (a copy of which is available through AAA's website, www.adr.org), the arbitrator's award will consist of a written statement as to the disposition of each claim and the relief, if any, awarded on each claim. The parties understand that the right to appeal or to seek modification of any ruling or award by the arbitrator is limited under state and federal law. Any award rendered by the arbitrator will be final and binding, and judgment may be entered on it in any court of competent jurisdiction. Nothing contained herein will restrict either party from seeking temporary injunctive relief in a court of law. In the unlikely event the AAA refuses to accept jurisdiction over a dispute, the parties agree to submit to Judicial-Arbitration-Mediation Services ("**JAMS**") mediation and arbitration applying the JAMS equivalent of the AAA Commercial Rules. If AAA and JAMS refuse to accept jurisdiction, the parties may litigate in a court of competent jurisdiction pursuant to Section 10.4.

8.2   <u>Class Action Waiver</u>. Any dispute-resolution proceeding must be brought in the Parties' individual capacities, and not as a plaintiff or class member in any purported class, collective, representative, multiple plaintiff, or similar proceeding ("**Class Action**").  The parties expressly waive any ability to maintain any Class Action in any forum. Unless the Parties later otherwise agree, the arbitrator shall not have authority to combine or aggregate similar claims or conduct any Class Action nor make an award to any person or entity not a party to the arbitration. Any claim that all or part of this Class Action Waiver is unenforceable, unconscionable, void, or voidable may be determined only by a court of competent jurisdiction and not by an arbitrator. The Parties understand that they would have had a right to litigate through a court, to have a judge or jury decide their case, and to be party to a class or representative action; however, the Parties understand that they are foregoing these rights and electing to have any dispute decided individually, through arbitration.

# 9   DEFINITIONS

9.1   "**Business Day**" means any day other than Saturday, Sunday, or U.S. federal holiday.

9.2   "**Confidential Information**" refers to confidential or proprietary information of a party including, without limitation, business plans, strategies, forecasts and projections and information about business structures, operations, systems, finances, assets, investments, investment strategies, software and other technology systems, and personnel, customers and suppliers. Confidential Information does not include if it (i) is known to the receiving party prior to receipt from the disclosing party directly or indirectly from a source other than one having an obligation of confidentiality to the disclosing party; (ii) becomes known (independently of disclosure by the disclosing party) to the receiving party directly or indirectly from a source other than one having an obligation of confidentiality to the disclosing party; (iii) becomes publicly known or otherwise ceases to be confidential, except through a breach of this Agreement by the receiving party; or (iv) is independently developed by the receiving party.

9.3   "**Delivery Date**" refers to the estimated date at which the Hardware is scheduled to be delivered to the Customer or the hosting location that the Customer instructs Compass to arrange the Hardware to be shipped.

9.4   "**Force Majeure Event**" means a failure by the other party to perform any of its obligations under this Agreement, if such failure is caused by events or circumstances beyond its reasonable control, including, without limitation, acts of God, war, labor strike, mechanical breakdown (including technological or information systems), plant shutdown, unavailability of or interference with necessary transportation, any raw material or power shortage, terrorist act, accident, fire, flood, earthquake, landslide, hurricane, typhoon, tsunami, volcanic eruption, inclement weather, health pandemic or epidemic, national, local or

regional emergency, any law, order, regulation, seizure or other action of any governing authority or agency. Notwithstanding the foregoing, in the event of such an occurrence, each party agrees to make a good faith effort to perform its obligations hereunder.

9.5    "*Hardware*" refers to the cryptocurrency mining hardware belonging to the Customer and specified in the Purchase Order.

9.6    "*Hosting Facility*" or "*Hosting Partner*" means a data center owned, leased, operated or reserved by Compass or Compass partners through the Site.

9.7    "*Hosting Service*" refers to services provided to Customer, if selected, by Compass to arrange shelf and/or rack space, sufficient electrical capacity at the required voltage and wattage, provision of electricity, monitoring and services of Hardware to achieve the Service Level (i.e., standard fixes, basic repairs or Hardware resets), and support from Compass Mining Concierge Team.

9.8    "*Losses*" means all damages, judgments, liabilities, losses and expenses, including without limitation, attorney's fees.

9.9    "*Manufacturer*" means the party that manufactures the Equipment as may be reflected in a Purchase Order.

9.10   "*Purchase Order*" means a written purchase order issued by Compass to the Customer for the Hardware.

9.11   "*Purchase Price*" means the total purchase price for the Hardware as reflected in the Purchase Order, including purchase price, import duties, tariffs, duties, shipping and insurance costs.

## 10    GENERAL PROVISIONS

10.1   <u>Captions and Section Headings</u>. Captions and section headings are for convenience only, are not a part of this Agreement and may not be used in construing it.

10.2   <u>Consent to Electronic Business</u>. Because Compass operates online, it is necessary for Customer to consent to transact business with Compass online and electronically. As part of doing business with Compass, therefore, we also need Customer to consent to our giving you certain disclosures electronically, either via the Compass website or to the email address you provide to us. By entering into this Agreement, Customer consents to receive electronically all documents, communications, notices, contracts, and agreements arising from or relating in any way to Customer's or Compass' rights, obligations, or services under this Agreement (each, a "*Disclosure*"). You will keep us informed of any change in your email or home address so that you can continue to receive all Disclosures in a timely fashion. If Customer's registered email address changes, you must notify us immediately of the change. Customer also agrees to update your registered residence address and contact information on the Compass website if they change. Customer's decision to do business with Compass electronically is made completely voluntarily.

10.3   <u>Entire Agreement</u>. This Agreement, including any Purchase Order(s) certificate, schedule, exhibit or other document delivered pursuant to its terms, constitutes the entire agreement between the parties and supersedes any other agreement, whether oral or written, with respect to the subject matter hereof. There are no verbal agreements, representations, warranties, undertakings or agreements between the parties. ANY WARRANTIES, TERMS, AND/OR CONDITIONS IN ANY PURCHASE AGREEMENTS, INVOICES, CREDIT APPLICATIONS, PURCHASE ORDERS, AND THE LIKE, OR ANY OTHER DOCUMENTS BETWEEN COMPASS AND CUSTOMER THAT CONFLICT WITH THE TERMS AND CONDITIONS SET FORTH HEREIN ARE GOVERNED BY THE TERMS HEREIN. Compass may at any time amend, modify or revise the terms of this Agreement by updating these terms and by providing notice to Customer of that change via the Compass Website and/or by email and unless Customer objects in writing within 5 days, Customer will be deemed to have agreed to any such modified, amended or revised terms in this Agreement.

10.4   <u>Governing Law</u>.  This Agreement and all claims arising out of or related to this Agreement are governed by and construed in accordance with the laws of the State of Delaware without giving effect to any choice or conflict of law provision or rule that would cause the application of the laws of any jurisdiction other than the State of Delaware. Only to the extent the dispute resolution provisions must be enforced, or in the event such provisions are not enforceable, or in connection with any necessary injunctive relief or to

enforce an arbitration award, the jurisdiction and venue shall be exclusively within the State and Federal courts located within the State of Delaware.

10.5    Injunctive Relief. The parties acknowledge that the Confidentiality provision of this Agreement is reasonable in scope and duration and are not unduly restrictive. Customer further acknowledge that a breach of any of confidentiality obligation of this Agreement will render irreparable harm to Compass, and that a remedy at law for breach of the Agreement is inadequate, and that Compass shall therefore be entitled to seek any and all equitable relief, including, but not limited to, temporary and permanent injunctive relief, without the necessity of posting a bond, and to any other remedy that may be available under any applicable law or agreement between the parties. Customer acknowledges and agrees that an award of damages to Compass does not preclude a court from ordering injunctive relief. Both damages and injunctive relief shall be proper modes of relief and are not to be considered as alternative remedies.

10.6    No Assignment. Customer will not assign or otherwise transfer this Agreement or any of the Customer's rights and obligations under this Agreement, without the prior written consent of Compass, which may be unreasonably withheld. Any assignment or transfer in violation of this Section 10.6 will be void. Compass may assign this Agreement without the Customer's consent and effective upon such assignment, the assignee is deemed substituted for Compass as a party to this Agreement and Compass is fully released from all of its obligations and duties to perform under this Agreement. Subject to the foregoing, this Agreement will be binding upon, and inure to the benefit of the parties and their respective permitted successors and assigns. The Customer may not merge this Agreement with any other agreements with Compass it may be party to.

10.7    Notice. All notices, requests, demands and other communications under this Agreement must be in writing and will be deemed duly given, unless otherwise expressly indicated to the contrary in this Agreement, (i) when personally delivered, (ii) upon receipt of a telephonic facsimile transmission with a confirmed telephonic transmission answer back, (iii) three (3) days after having been deposited in the United States mail, certified or registered, return receipt requested, postage prepaid, (iv) one (1) Business Day after having been dispatched by a nationally recognized overnight courier service, or (v) on the date transmitted if by email, addressed to the parties or their permitted assigns at such address or number as is given in writing by either party to the other.

10.8    Relationship of the Parties. Nothing in this Agreement shall be deemed to create an agency, employment, partnership, fiduciary or joint venture relationship between the parties. Neither party has the power or authority as agent, employee or in any other capacity to represent, act for, bind or otherwise create or assume any obligation on behalf of the other party for any purpose whatsoever without the other's prior written consent.

10.9    Survival. Any provision of this Agreement, which, by its nature, would survive termination or expiration of this Agreement, will survive any such termination or expiration, including, without limitation, the following sections: Payment Terms and Taxes (Section 2), Representations and Warranties (Section 5), Limitations of Liability (Section 6), Confidentiality (Section 7), Disputes (Section 8), General Provisions (Section 10).

10.10    Waivers. Any failure by any of the parties to comply with any of the obligations, agreements or conditions set forth in this Agreement may be waived by the other party or parties, but any such waiver will not be deemed a waiver of any other obligation, agreement or condition contained herein.

10.11    Liquidated Damages Not Penalty. It is expressly agreed that any liquidated damages payable under this Agreement do not constitute a penalty and that the Parties, having negotiated in good faith for such specific liquidated damages and having agreed that the amount of such liquidated damages is reasonable in light of the anticipated harm caused by the breach related thereto and the difficulties of proof of loss and inconvenience or non-feasibility of obtaining any adequate remedy, are estopped from contesting the validity or enforceability of such liquidated damages.

10.12    No Restrictions Against Compass. Customer hereby acknowledges and agrees that Compass may sell any inventory, equipment, machinery, or other products, not specified in Purchase Order hereto to any party pursuant to any terms and conditions agreed to by Compass and nothing in this Agreement shall restrict Customer from the same.

10.13    Counterparts; Electronic Execution. This Agreement may be executed in any manner of counterparts, all of which shall constitute in any number of counterparts, all of which shall constitute one and the same

instrument, and any Party hereto may execute this Agreement, by signing and delivering one or more counterparts. Each Party agrees that this Agreement and any other documents to be delivered in connection herewith may be electronically signed or electronically agreed, and that any electronic signatures, acknowledgements or agreements are the same as handwritten signatures for the purposes of validity, enforceability, and admissibility.

***This is <u>not</u> a contract of insurance and Compass Mining is not an insurance company.***

**COMPASS PROTECTION PLAN AGREEMENT**

**Addendum to Compass Hosting Service Agreement**

Compass Mining, Inc. ("***Compass***," "***we***," "***us***," or "***our***") provides the customer identified on the signature or acknowledgement page ("***Customer***," "***you***," or "***your***") with the Hosting Service pursuant to the terms and conditions of the Compass Hosting Service Agreement that you have entered into with Compass (the "***Hosting Agreement***"). Defined terms used herein shall have the same meanings attributed to them in the Agreement. The Hosting Agreement states your Customer Hardware is hosted at the Hosting Facility(ies) at your risk of loss or damage, and Compass and Hosting Partner are not liable for loss of or damage to your Customer Hardware.

For an additional annual charge and as per the terms, conditions, and limitations of this Protection Plan Agreement detailed below, Compass will agree to a limited retention of liability up to the applicable protection limit in connection with payment of the applicable Annual Protection Fee.

1.    Compass Protection Plan Agreement – Limited Retention of Liability. In consideration of the payment of the Annual Protection Fee by Customer, in addition to Customer's Hosting Service Fee, Compass shall not require the full risk of loss assumption by Customer as stated in Paragraph 12.1 of the Hosting Agreement, up to the applicable protection limit as indicated by Compass in connection with payment of the applicable Annual Protection Fee. The liability of Compass under this Compass Protection Plan Agreement shall be limited to loss or damage that occurs as a result of Compass' negligence or as a result of acts or omissions for which Compass is otherwise directly liable under the law. Loss or damage may be caused by but not necessarily limited to fire, theft, water damage or vandalism resulting from negligent operations of the Hosting Partner. Compass reserves the right to provide written notice to modify its fees for participation in the Compass Protection Plan upon no less than thirty (30) days.

2.    Limit of Protection. The most Compass will pay for loss or damage to your Customer Hardware under this Compass Protection Plan Agreement is the applicable protection limit as chosen by Compass in connection with payment of the applicable Annual Protection Fee.

3.    Exclusions from Protection. **Compass will not pay for damage to Customer Hardware caused by any of the following:** flood, surface water, underground water, or water that backs up through or overflows from a sewer, drain or sump; terrorist attack, ware or military action, nuclear reaction, nuclear radiation or radioactive contamination, computer virus or computer hacking, wear and tear, earth movement, and civil authority.

4.    Amount Payable Upon Loss. For any single liability event, which is not otherwise excluded, Compass will pay the lesser of the actual amount you reasonably pay to repair damaged item(s) or to replace lost or damaged Customer Hardware with property of similar quality. In no event will Compass pay more than the limit of protection chosen by Compass in connection with payment of the applicable Annual Protection Fee.

5.    Failure to Pay Annual Protection Fee. If payment of the Annual Protection Fee is not received by Compass, Customer's participation in the Compass Protection Plan shall immediately terminate without any further action required and Compass shall not be liable for loss of or damage to Customer's Customer Hardware from any cause whatsoever.

6.    Term of Protection Plan. The initial term of your Compass Protection Plan shall be for a one-year period, stated in the order attached or incorporated by reference (the "Initial Term"); *provided*, that if the current term of your Hosting Agreement is less than one year you would only pay a prorated amount of the Annual Protection Fee for the remaining term of your Hosting Agreement and that remaining term would be your Initial Term hereunder. Upon expiration of the Initial Term your Compass Protection Plan will renew automatically for successive one-year periods, subject to your payment of the then applicable Annual Protection Fee (each a "Renewal Term", and together with the Initial Term, the "Term"), unless either party provides written notice to the other party of its desire to avoid the Renewal Term at least thirty (30) days in advance of the conclusion of the Initial Term or the then-current Renewal Term, as applicable.

7.    <u>Termination</u>. Customer may cancel participation in the Compass Protection Plan by terminating this Compass Protection Plan Agreement by providing written notice to Compass at least ten (10) days. Compass may cancel this plan upon thirty (30) days written notice to Customer. If this Agreement is terminated, Compass will refund to Customer any prepaid and unused portion of the Annual Protection Fee covering the remainder of the Term after the effective date of termination.

8.    <u>Hosting Agreement</u>. All terms and conditions of the Hosting Agreement not specifically modified by this Compass Protection Plan Agreement are in effect and binding on both Compass and Customer and are incorporated by reference herein.

9.    <u>Governing Law; Dispute Resolution</u>. This Compass Protection Plan Agreement and all claims arising out of or related to this Compass Protection Plan Agreement are governed by and construed in accordance with the laws of the State of Delaware without giving effect to any choice or conflict of law provision or rule that would cause the application of the laws of any jurisdiction other than the State of Delaware. The parties acknowledge and agree that the dispute resolution provisions contained in Section 13 of the Hosting Agreement shall apply to any disputes related to this Compass Protection Plan Agreement.  Only in the event such provisions are not enforceable, the jurisdiction and venue for any dispute related to this Compass Protection Plan Agreement shall be exclusively within the State and Federal courts located within the State of Delaware. To the fullest extent permitted by law, the parties hereto agree to waive their rights to seek remedies in court, including but not limited to rights to a trial by jury.

10.    <u>Consent to Electronic Business</u>. Because Compass operates online, it is necessary for Customer to consent to transact business with Compass online and electronically. As part of doing business with Compass, therefore, Customer consents to Compass giving Customer certain disclosures electronically, either via the Compass website, platform or to the email address you provide to us. By entering into this Compass Protection Plan Agreement, Customer consents to receive electronically all documents, communications, notices, contracts, and agreements arising from or relating in any way to Customer's or Compass' rights, obligations, or services under this Compass Protection Plan Agreement (each, a "***Disclosure***"). You will keep us informed of any change in your email or home address so that you can continue to receive all Disclosures in a timely fashion. If Customer's registered email address changes, you must notify us immediately of the change. Customer also agrees to update your registered residence address and contact information on the Compass website if they change. Customer's decision to do business with Compass electronically is made completely voluntarily.

11.    <u>Counterparts; Electronic Execution</u>. This Compass Protection Plan Agreement may be executed in any manner of counterparts, all of which shall constitute in any number of counterparts, all of which shall constitute one and the same instrument, and any Party hereto may execute this Compass Protection Plan Agreement, by signing and delivering one or more counterparts. Each Party agrees that this Compass Protection Plan Agreement and any other documents to be delivered in connection herewith may be electronically signed or electronically agreed, and that any electronic signatures or agreements appearing in connection with this Compass Protection Plan Agreement or such other documents are the same as handwritten signatures for the purposes of validity, enforceability, and admissibility.

12.    <u>PROTECTION PLAN IS NOT A POLICY OF INSURANCE</u>. **THIS COMPASS PROTECTION PLAN AGREEMENT, INCLUDING THE LIMITED RETENTION OF LIABILITY CONTAINED HEREIN, IS NOT AN INSURANCE POLICY AND COMPASS MINING, INC. IS NOT AN INSURANCE COMPANY. COMPASS MINING, INC. SHALL PERFORM THE OBLIGATIONS DESCRIBED IN THIS COMPASS PROTECTION PLAN AGREEMENT. COMPASS MINING, INC. ASSUMES THIS BUSINESS RISK ON ITS OWN, BUT IT MAY PURCHASE INSURANCE COVERAGE TO TRANSFER PART OR ALL OF THE LIABILITY RETAINED UNDER THIS COMPASS PROTECTION PLAN AGREEMENT.**