O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| VERIBI, LLC, a Nevada limited liability company,<br><br>                                Plaintiff,<br><br>      v.<br><br>COMPASS MINING, INC., a Delaware corporation,<br><br>                                Defendant. | Case No.:  2:22-cv-04537-MEMF-JPR<br><br>**ORDER DENYING DEFENDANT'S MOTION TO COMPEL ARBITRATION [ECF NO. 15]** |

      Before the Court is the Motion to Compel Arbitration (ECF No. 15) filed by Defendant Compass Mining, Inc. For the reasons provided below, the Court hereby DENIES the Motion to Compel Arbitration.

///

///

1

I. **Background**

A. **Factual Background**[1]

Plaintiff Veribi, LLC ("Veribi") brings this suit against Defendant Compass Mining, Inc. ("Compass"). Veribi is a Nevada limited liability company engaged in the business of bitcoin mining. Compl. ¶¶ 3, 5. Compass is a Delaware corporation that provides hosting services and mining systems for bitcoin mining. *Id.* ¶ 7. Bitcoin mining is the process of applying computing power to solve cryptographic problems to produce or "mint" new bitcoins, a process that is "energy intensive" and typically located in places with low energy costs and high production capacity. *Id.* ¶¶ 5, 8. Compass provides its customers with the necessary means to mine cryptocurrency, which includes selling computers required to mine cryptocurrency ("miners") and provision of hosting services for a customer's miners. Declaration of Thomas Heller, ECF No. 15-1 ("Heller Decl.") ¶ 5. Hosting services include providing access to facilities sufficient to support the operation of miners, as well as electricity to run the miners. *Id.*

Compass contracted with BitRiver, a major Russian hosting company incorporated in Switzerland, to provide hosting services in Russia for Compass's North American clients. Compl. ¶¶ 9, 15. Executive Order 14024 was issued on April 15, 2021, mandating, in relevant part:

> Section 1. **All property and interests in property** that are in the United States, that hereafter come within the United States, or that are or hereafter come within the possession or control of any United States person **of the following persons are blocked and may not be transferred, paid, exported, withdrawn, or otherwise dealt in**:
> (a)     **Any person determined by Secretary of Treasury**, in consultation with the Secretary of State, and, with respect to subsection (a)(ii) of this section, in consultation with the Attorney General, or by the Secretary of State, in consultation with the Secretary of Treasury, and with respect to subsection (a)(ii) of this section, in consultation with the Attorney General:
> > (i) **To operate or have operated in the technology sector or the defense and related materiel sector of the Russian Federation economy, or any other sector of the Russian Federation economy as may be determined by the Secretary of Treasury, in consultation with the Secretary of State**;

---

[1] Unless otherwise indicated, the following factual background is derived from the Complaint. ECF No. 1 ("Compl.").

> (ii) **To be responsible for or complicit in, or to have directly or indirectly engaged or attempted to engage in, any of the following for or on behalf of, or for the benefit of, directly or indirectly, the Government of the Russian Federation** . . . .

31 C.F.R. § Pt. 587, App. A (2022) (emphasis added).

Between May 2021 and January 2022, Veribi purchased 140 bitcoin mining servers and service plans from Compass for approximately 1.5 million dollars, which Compass managed at BitRiver's facility in Russia. *Id.* ¶ 16. In November 2021, satellite images showed an ongoing buildup of Russian forces near Ukraine. *Id.* ¶ 18. On March 3, 2022, Compass issued a statement to ease customer concerns regarding the Russian invasion and sanctions, stating "business as usual." *Id.* ¶ 21. On April 20, 2022, the U.S. Department of the Treasury's Office for Foreign Assets Control (OFAC) designated BitRiver AG, Compass's hosting partner in Russia, and other affiliated companies as subject to Executive Order 14024. *Id.* ¶ 22.

On April 21, 2022, Compass issued a notice via email to customers that it "terminated contractual relationship and business dealings with BitRiver" due to the designation of BitRiver as subject to Executive Order 14024. *Id.* ¶ 24. Concerned with its investments, Veribi contacted BitRiver to attempt to remove its miners from Russia or sell them to a non-sanctioned third party. *Id.* ¶ 26. On May 6, 2022, BitRiver responded to Veribi's email, stating that Compass was the owner of its customers' miners in BitRiver's possession and control and, as a result, Veribi was instead required to direct all queries regarding the equipment to Compass. *Id.* On May 9, 2022, Veribi advised Compass to instruct BitRiver to prepare its miners for shipment out of Russia. *Id.* ¶ 27. However, Compass responded that it was unable to conduct or facilitate any business dealings with BitRiver pursuant to the U.S. government's prohibition against conducting business with BitRiver. *Id.*

1. Veribi's Purchases

Veribi made five separate purchases and received invoices for miners and hosting services it purchased from Compass on May 18, 2021, June 9, 2021, August 5, 2021, January 14, 2022, and January 26, 2022. Heller Decl. ¶ 12; *see also* ECF No. 15-2 ("Compass Invoices"). The invoices issued to Veribi from June 2021 to January 2022 included the following notice in a footnote: "By

paying for this invoice and paying the security deposit, you are agreeing to the Compass Mining Hosting Terms and Conditions. The Terms and Conditions are available on request." *See generally* Compass Invoices.[2]

Veribi also made two purchases of miners online through the Compass website, on March 31, 2021, and July 30, 2021. Heller Decl. ¶¶ 29–30. Customers completing an online transaction via Compass's website are required to scroll through the CHSA, click "Ok, I agree," and then check a box affirming: "I have read and agree to the Compass Hosting Service Agreement." *Id.* ¶ 32. On the website's checkout page, the "pay with" options are disabled until the customer checks the box next to the statement, "I have read and agree to the Compass Hosting Service Agreement." *Id.* ¶ 34. Customers who try to click on a payment option without checking the box are blocked by an error, and a message in red appears, stating, "You need to accept the Compass Hosting Service Agreement." *Id.* When a customer clicks the box next to "I have read and agree to the Compass Hosting Service Agreement," the Agreement automatically pops up on the customer's screen. *Id.* Once the Agreement pops up, a customer cannot accept or agree to the Agreement until they scroll to the bottom of the document.[3] *Id.*

### B. Compass Hosting Service Agreement

Beginning in July 2021, the CHSA included a provision labeled "Disputes" that provides in relevant part:

> To the fullest extent permitted by law, the parties hereto (the "Parties") agree to waive their right to seek remedies in court, including but not limited to rights to a trial by jury. The Parties agree that **any dispute between or among them or their subsidiaries, affiliates or related entities arising out of, relating to or in connection with this Agreement, will be resolved in accordance with a confidential two-step dispute resolution procedure involving: (1) non-binding mediation, and (2) binding**

---

[2] The Court notes that throughout the parties' briefing, they refer to three different agreements: the Compass Mining Hosting Terms and Conditions, Compass Hosting Services Agreement, and Master Compass Hosting Service Agreement. During the hearing, the parties confirmed that all three of these are different names for the same document. The Court will hereinafter refer to this agreement as the Compass Hosting Services Agreement ("CHSA"). Supplemental Declaration of Heller ("Heller Supp. Decl."), ECF No. 31-5, at ¶ 8.

[3] Although it is clear that Veribi was required to assent to the CHSA in this manner during its July 30, 2021 transaction, it is disputed whether the March 31, 2021 transaction also required this same lengthy process.

**arbitration** under the Federal Arbitration Act, 9 U.S.C. 1, et seq., or state law, whichever is applicable . . . .

ECF No. 15-7, Ex. F ("July 2021 CHSA"), at 10 (emphasis added). The subsequently revised versions of the CHSA, dated August 2021 and January 2022, contain substantially the same arbitration provision as the July 2021 CHSA.[4]

## II. Procedural History

On July 1, 2022, Veribi filed its Complaint against Compass, alleging: (1) breach of contract, (2) negligence, (3) conversion, and (4) fraud. *See generally* Compl. On August 10, 2022, Compass filed a Motion to Dismiss and a Motion to Compel Arbitration. ECF Nos. 13 ("MTD"), 15 ("MTCA"). The Motion to Compel Arbitration was fully briefed on August 23, 2022. ECF Nos. 24 ("MTCA Opp'n"), 31 ("MTCA Reply"). On September 1, 2022, the Motion to Dismiss was fully briefed. ECF Nos. 27 ("MTD Opp'n"), 32 ("MTD Reply"). On November 10, 2022, Compass filed an Application for Leave to File Notice of Supplemental Authority in Support of its Motion to Compel Arbitration. ECF No. 34. The Court granted leave on November 11, 2022. ECF No. 35. The Court heard oral argument on the Motions on November 17, 2022.

## III. Applicable Law

### A. Arbitration Agreements

Under Section 2 of the Federal Arbitration Act ("FAA"), arbitration clauses in contracts "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The FAA reflects the "fundamental principle that arbitration is a matter of contract." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (quoting *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 67 (2010)). "If an ordinary procedural rule—whether of waiver or forfeiture or what-have-you—would counsel against enforcement of an arbitration contract, then so be it. The federal policy is about treating arbitration contracts like all

---

[4] The only change made between the July 2021 and August 2021 versions of the CHSA was to renumber the arbitration provision as section 8 rather than section 13. As for the January 2022 CHSA, the only change made was the addition of a 8.1 subheading and title: Mediation and Binding Arbitration.

others, not about fostering arbitration." *Morgan v. Sundance, Inc.*, 142 S. Ct. 1708, 1713 (2022).

"[T]he party seeking to compel arbitration[] has the burden of proving the existence of an agreement to arbitrate by a preponderance of the evidence." *Knutson v. Sirius XM Radio Inc.*, 771 F.3d 559, 565 (9th Cir. 2014). In determining whether to compel arbitration, the court must consider two gateway factors: (1) whether there is an agreement to arbitrate between the parties; and (2) whether the agreement covers the dispute. *Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015) (quoting *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84 (2002)). Moreover, arbitration agreements may be invalidated by "generally applicable contract defenses, such as fraud, duress, or unconscionability, but not by defenses that apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue." *Concepcion*, 563 U.S. at 343 (internal quotation marks omitted) (citing *Doctor's Assoc., Inc. v. Casarotto*, 517 U.S. 681, 687 (1996)). The Act "leaves no place for the exercise of discretion by a district court, but instead mandates that district courts shall direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985).

A petition to compel arbitration is to be heard in the manner of a motion; factual issues are submitted on affidavits or declarations, or on oral testimony in court's discretion. *Strauch v. Eyring*, 35 Cal. Rptr. 2d 747, 748 (Ct. App. 1994).

### B. Online Formation of Contract Agreements

The Court begins its discussion with a review of the various manners in which online providers seek to impose contractual terms on consumers. California courts have identified four categories of internet contract formation, "most easily defined by the way in which the user purportedly gives their assent to be bound by the associated terms: browsewraps, clickwraps, scrollwraps, and sign-in wraps." *B.D. v. Blizzard Ent., Inc.*, 292 Cal. Rptr. 3d 47, 60 (Ct. App. 2022).

> A "browsewrap" agreement is one in which an internet user accepts a website's terms of use merely by browsing the site. A "clickwrap" agreement is one in which an internet user accepts a website's terms of use by clicking an "I agree" or "I accept" button, with a link to the agreement readily available. **A "scrollwrap" agreement is like a "clickwrap," but the user is presented with the entire agreement and must physically scroll to the bottom of it to find the "I agree" or "I accept"**

> **button. . . .** "Sign-in-wrap" agreements are those in which a user signs up to use an internet product or service, and the sign-up screen states that acceptance of a separate agreement is required before the user can access the service. While a link to the separate agreement is provided, users are not required to indicate that they have read the agreement's terms before signing up.

*Sellers v. JustAnswer LLC*, 289 Cal. Rptr. 3d 1, 15 (Ct. App. 2021) (emphasis added).

"The 'wrap' methods of online contract-formation provide varying degrees of notice to users, with browsewrap providing the least and scrollwrap providing the most." *Blizzard*, 292 Cal. Rptr. 3d at 60. As such, California courts have generally "reached consistent conclusions when evaluating the enforceability of agreements at either end of the spectrum, generally finding scrollwrap and clickwrap agreements to be enforceable and browsewrap agreements to be unenforceable." *Id.*

## IV. Discussion

Compass moves to compel arbitration of the entire action under the CHSA on the grounds that (1) the parties formed a valid arbitration agreement; and (2) the arbitration agreement encompasses Veribi's claims. MTCA at 1. In response, Veribi contends that the MTCA should be denied because Veribi did not agree to the arbitration agreement and Compass's invoices did not provide inquiry notice of the CHSA. MTCA Opp'n at 6–8.

### A. The parties formed a valid arbitration agreement.

Compass contends that the parties formed a valid agreement to arbitrate when Veribi: (1) agreed to the Compass Hosting Service Agreement, which included an arbitration provision, when making purchases through direct invoices; and (2) made online purchases through the Compass website, which required Veribi to expressly agree to the terms set forth in Compass's Hosting Service Agreement, including its arbitration provision. MTCA at 2–3, 5–8.

Under California law, the necessary elements for a contract are: (1) "[p]arties are capable of contracting"; (2) "[t]heir consent"; (3) "[a] lawful object"; and (4) "[s]ufficient cause or consideration." *U.S. ex rel. Oliver v. Parsons Co.*, 195 F.3d 457, 462 (9th Cir. 1999) (quoting Cal. Civ. Code § 1550). Here, the parties do not dispute that the parties are capable of contracting, that the arbitration agreement pursues a lawful object, or that sufficient cause or consideration existed.

Rather, the main dispute in this case concerns the second element—whether there was mutual assent to the Arbitration Agreement.[5]

As discussed above, courts recognize a variety of forms of online contract formation between website operators and consumers. Where the website operator can show that the consumer had actual knowledge of the agreement in question, the analysis is very straightforward. But even where the website operator does not show that the consumer had actual knowledge of the agreement, an enforceable contract may still "be found based on an inquiry notice theory." *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 856 (9th Cir. 2022). Under an inquiry notice theory, an enforceable contract will be found "only if: (1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms." *Id.* This is because "[r]easonably conspicuous notice of the existence of contract terms and unambiguous manifestation of assent to those terms by consumers are essential if electronic bargaining is to have integrity and credibility." *Id.*

Compass does not allege in its Motion to Compel Arbitration that Veribi had actual knowledge of the agreement through the website. As a result, in order to establish the existence of an enforceable contract, Compass must prove that: (1) it provided "reasonably conspicuous notice" of the CHSA's arbitration provision; and (2) Veribi took some action, "such as clicking a button or checking a box, that unambiguously manifests [its] assent to those terms." *Berman*, 30 F.4th at 856. It is undisputed that Veribi "took some action" by (1) paying its invoices, and (2) checking the box that read "I have read and agree to the Compass Hosting Service Agreement" and indicating that it agreed and accepted the terms on the Compass website. Rather, the issues presented are: (a) whether or not Compass provided reasonably conspicuous notice of the CHSA's arbitration provision to

---

[5] The CHSA provides a choice of law provision that identifies Delaware law as the applicable substantive law. Ex. F at 13. ECF No. 15-7. Compass contends that the outcome of the issue regarding arbitrability would be the same whether under California or Delaware law. MTCA at 5 n.3. Moreover, both parties appear to rely on California authorities in arguing the motion. *See generally* MTCA Mot.; MTCA Opp'n; MTCA Reply. The parties also agreed during the hearing on this matter that California law should be applied in analyzing the issues presented in this Motion to Compel Arbitration. The Court therefore will analyze the Motion to Compel Arbitration under California law.

Veribi such that its terms are enforceable and (b) whether the actions taken by Veribi unambiguously manifest assent. Compass argues that there was mutual assent to the arbitration agreement because (1) Compass provided inquiry notice of the CHSA in multiple invoices and (2) Veribi reviewed, twice acknowledged, and agreed to the terms as a requirement of completing an online transaction on July 30, 2021. MTCA at 3. Veribi counters that (1) Compass's invoices did not provide reasonably conspicuous notice of the CHSA and (2) Veribi's purchase of the miners in the online transactions are not the same miners at issue and it did not unambiguously manifest its assent to the CHSA when placing orders online through Compass's website. MTCA Opp'n at 6–9.

1. <u>Compass failed to provide reasonably conspicuous notice of the CHSA through its invoices.</u>

Compass contends that there was sufficient notice of the terms of the CHSA in its invoices. At the bottom of the invoice, a note stated: "By paying for this invoice and paying the security deposit, you are agreeing to the Compass Mining Hosting Terms and Conditions." MTCA at 1. Veribi contends that Compass's invoices were "inconspicuous[ly] reference[d]" as it "fails to provide any information about the content of the alleged 'Terms and Conditions.'" MTCA Opp'n 8–9.

Under California law, it is long undisputed that mutual assent is a required element of contract formation. *Knutson*, F.3d at 565. Courts deny effect to such qualifying provisions on letterheads or other common documents unless referred to in the body of the letter or other writing or expressly brought to the offeree's attention. 2 Williston on Contracts § 6:48 (4th ed. 2022). To bind someone to a contractual provision contained in a non-contractual document, webpage, or electronic record, the circumstances must show that they (1) learned about the provision or had a reason to know about it based on its conspicuity, and (2) assented to it. 1 Corbin on Contracts § 2.12 (2022). A printed billhead in no way controls, modifies, or alters the terms of the contract. *Sturm v. Boker*, 150 U.S. 312, 326–37 (1893). A provision contained in fine print on the front and reverse side of standard form does not constitute a written agreement to the provision. *Windsor Mills, Inc. v. Collins & Aikman Corp.*, 101 Cal. Rptr. 347, 348 (Ct. App. 1972).

Compass argues that the reference of the terms in its invoices is sufficient notice, as inquiry notice of the terms and conditions of an agreement in billing statements and "continued acceptance of defendant's services constituted assent to the agreement." MTCA at 6 (quoting *Hart v. Charter Comms., Inc.*, 814 F. App'x 211, 213–14 (9th Cir. 2020)).

"[R]egardless of apparent manifestation of his consent, [an offeree] is not bound by inconspicuous contractual provisions of which he was unaware, contained in a document whose contractual nature is not obvious." *Long v. Provide Commerce, Inc.*, 200 Cal. Rptr. 3d 117, 122 (Ct. App. 2016) (quoting *Windsor Mills, Inc.*, 101 Cal. Rptr. at 351). An offeree knowing that an offer has been made to him but not knowing all its terms may be held to have accepted, by his conduct, whatever terms the offer contains. *Windsor Mills, Inc.*, 101 Cal. Rptr. at 350. However, when the offeree does not know that a proposal has been made to him, this objective standard does not apply. *Id.* at 351.

Here, the Court finds that this case is similar to *Windsor*—where the court declined to compel arbitration when defendant sent multiple Acknowledgment of Order forms stating that the order was "subject to all of the terms and conditions on the face and reverse sides," including an arbitration provision, but plaintiff had no actual knowledge that the forms contained a reference to arbitration. *Windsor Mills, Inc.*, 101 Cal. Rptr. at 348–50. As in *Windsor*, Veribi was unaware of the CHSA referenced by Compass's invoices, nor did Compass call to its attention what terms the CHSA contained in its invoices.

Compass contends that their invoices provided sufficient notice of the CHSA in "Note 4" at the bottom of the invoice, which states: "By paying for this invoice and paying the security deposit, you are agreeing to the [CHSA]. The Terms and Conditions are available on request." MTCA at 1 (quoting Compass Invoices); *see generally* Compass Invoices. Compass cites to *Moran* in support of its argument. *See Moran v. Charter Comms., Inc.*, 2020 WL 5833640, at *2 (C.D. Cal. June 11, 2020). However, *Moran* is distinguishable in that the defendant in *Moran* included a more detailed statement in its monthly billing statements, which provided "notice that the terms and conditions for services contain a binding arbitration provision." *Id.* Additionally, the *Windsor* defendant provided more notice than Compass did in the instant case, as it printed the relevant arbitration provision on

the reverse side of its Acknowledgement of Order forms. *Windsor Mills, Inc.*, 101 Cal. Rptr. at 349. No such notice or mention of the binding arbitration provision was included in Compass's invoices. As such, Compass seeks to bind Veribi with a "document whose contractual nature is not obvious"—the Invoices neither provided a hyperlink to the terms and conditions of the CHSA, nor did they detail what terms and conditions were included. *Id.* at 351. In fact, Veribi was required to take additional steps in order to obtain notice of the terms of the CHSA—here, it was required to request a copy of the CHSA from Compass.

During the hearing on this matter, Compass also cited to *Hart* in support of its contention. In *Hart*, the Ninth Circuit in an unpublished opinion held that "[t]he district court did not err by determining that [the plaintiff] had inquiry notice of [the defendants'] subscriber agreement as a result of the notice she received in two billing statements." *Hart*, 814 F. App'x at 213–14. The Ninth Circuit found that the notice "was sufficiently clear and conspicuous to provide a reasonably prudent subscriber with constructive notice of the proposed contract terms." *Id.* However, *Hart* is distinguishable in that the defendants' billing statements noted that "there was a new agreement that contained an arbitration clause," and such notices were "conspicuously featured in the substantive portion of the billing statements, on the page that contained the charges and payment due date, with the same font size as the substantive billing line items." *Hart v. Charter Comms., Inc.*, 2017 WL 6942425, at *4 (C.D. Cal. Nov. 8, 2017).[6] As discussed above, the Compass invoices provided no notice of any binding arbitration provisions, and the reference to the Hosting Terms and Conditions was made in a footnote.

Therefore, the Court finds that Compass's invoices failed to provide sufficient notice of the terms of the CHSA.

2. Compass's invoices did not provide reasonably conspicuous notice of the revised versions of the CHSA.

For "changes in terms to be binding pursuant to a change-of terms provision in the original contract, both parties to the contract—not just the drafting party—must have notice of the change in

---

[6] Although the Ninth Circuit did not provide details describing the notices in question, the district court described the notices and the factors it considered before concluding that the plaintiffs had sufficient notice.

contract terms." *Stover v. Experian Holdings, Inc.*, 978 F.3d 1082, 1086 (9th Cir. 2020). Notice—actual, inquiry, or constructive—is the "touchstone for assent to a contract, and the resulting enforceability of changed terms in an agreement." *Id.* at 1086; *see Douglas v. U.S. Dist. Ct. for Cent. Dist. of California*, 495 F.3d 1062 (9th Cir. 2007); *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171 (9th Cir. 2014). A party with a "unilateral right to modify a contract" does not have "carte blanche to make any kind of change whatsoever as long as a specified procedure is followed." *Badie v. Bank of Am.*, 79 Cal. Rptr. 2d 273, 281 (Ct. App. 1998). A revised contract is merely an offer and does not bind parties until it is accepted. *Douglas*, 495 F.3d at 1066 (quoting *Matanuska Val Farmers Cooperating Ass'n v. Monaghan*, 188 F.2d 906, 909 (9th Cir. 1951)). On a motion to compel arbitration, the party seeking arbitration has the burden of providing the existence of an agreement to arbitrate. *Knutson*, 771 F.3d at 565.

     In *Douglas*, the defendant revised its contract with an existing customer without providing notice of these revisions, which included, among other edits, an arbitration clause. *Douglas*, 495 F.3d 1062. The court ultimately concluded that, by doing so, the defendant provided insufficient notice as to the new terms of the contract and, as a result, the court declined to compel arbitration. Similarly, Compass revised the CHSA without providing notice of the revisions to Veribi. Compass added the arbitration provision to the CHSA beginning in July 2021, at the time when Veribi had a continuing and existing relationship with Compass. MTCA at 1. Compass argues that its invoices provided sufficient notice of the CHSA, but Note 4 was never altered to reflect what revisions to the CHSA were made. Compass made multiple revisions to the CHSA, as shown by the numerous versions of the CHSA it submitted. Supplemental Declaration of Heller ("Heller Supp. Decl."), ECF No. 31-5 ¶ 5; *see also* July 2021 CHSA; ECF Nos. 15-4, 15-5, 15-6, 15-8, 15-9. Under *Douglas*, Veribi had no obligation to "check the terms on a periodic basis to learn whether they have been changed by the other side," and, in particular, to check Compass's website to determine whether the CHSA had been revised. Thus, it would be "fairly cumbersome" for Veribi to "compare every word of the posted contract with the existing contract in order to detect whether it had changed." *Douglas*, 495 F.3d at 1066 n.1.

Furthermore, the Court observes that the dates shown on each version of the CHSA reflect dates that the given version was "implemented internally," but the date that a given version went live on Compass's website is shown by the external rollout date, which came at most four days later. Heller Supp. Decl. ¶ 6. Although Veribi's continued use of Compass's services could be considered assent, "such assent can only be inferred after [plaintiff] received proper notice of the proposed changes," and the Court finds that the facts here do not indicate that Veribi assented to the terms of each revised version of the CHSA. *Douglas*, 495 F.3d at 1066. Compass further contends that Veribi received "multiple short invoices stating prominently that transactions were governed" by the CHSA and that by "paying the invoices, Veribi agreed to those terms." MTCA Reply at 5. However, Veribi did not have an opportunity to accept or reject the revisions of the CHSA. Compass's Note 4 in its invoices was insufficient to provide Veribi an "opportunity to accept or reject" the revisions of the CHSA because the CHSA was not provided by Compass but was "upon request" by Veribi. *Knutson*, 771 F.3d at 565; Heller Decl. ¶ 24. Nor was the notice of the revised versions of the CHSA via footnote of its invoice was not sufficient to provide notice, and without evidence of actual knowledge, "a reasonably prudent [plaintiff] would [not] have been on inquiry notice that [an agreement] existed." *Knutson*, 771 F.3d at 569.

Finally, defendant argues that the "length of time between receipt of goods/services and receipt of the terms and conditions containing an arbitration agreement is irrelevant where the agreement contains terms of an ongoing contractual relationship for services." MTCA at 7 (citing *Bischoff v. DirectTV, Inc.*, 180 F. Supp. 2d 1097 (C.D. Cal. 2002)). The Court distinguishes the instant facts from *Bischoff*: in Bischoff, although the defendant provided the entire customer agreement—which contained the arbitration provision—*after* the parties entered into the customer agreement by phone, the court only found the length of time irrelevant and the later provision of the agreement acceptable because that customer agreement did not constitute a "new term" or "change" to the terms of a prior agreement. *Bischoff*, 180 F. Supp. 2d at 1103–04.  Rather, it was part of the "ongoing contractual relationship" with a brand new customer; there was no prior version of the customer agreement. *Id.* In contrast, here, Compass stated that the CHSA *did not include an arbitration provision* until July 2021, *after* Compass and Veribi already had an existing relationship.

MTCA at 1. Although Veribi continued to use Compass's hosting services, California has established that a "revised contract containing an arbitration clause is unenforceable against existing customers," even if notice was provided by mail. *Douglas*, 495 F.3d at 1067 (quoting *Badie*, 79 Cal. Rtpr. 2d at 273). Therefore, the Court finds that Compass's invoices did not establish mutual assent between the parties regarding the revised versions of the CHSA, including the addition of the arbitration provision.

       3.   <u>The "scrollwrap" agreement within Veribi's online transactions on Compass's website provided sufficient notice of the July 2021 CHSA arbitration provision.</u>

Compass argues that Veribi had sufficient notice of the CHSA and its arbitration provision through the online transaction it completed using Compass's website on July 30, 2021. MTCA Reply at 2–6.

When the language of a contract is clear and not absurd, it will be followed. *Edward v. Arthur Andersen LLP*, 189 P.3d 285, 295 (Cal. 2008). "A contract is ambiguous if a genuine doubt appears as to its meaning . . . the written instrument remains reasonably susceptible to at least two reasonable but conflicting meanings when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement . . . ." 11 Williston on Contracts § 30:4 (4th ed. 2022).

Here, the Court will rely on the terms of the July 2021 CHSA. The July 2021 CHSA was the operative copy as of July 30, 2021, the date of Veribi's latest online purchase from Compass's website. Although subsequent versions of the CHSA have been issued, the Court declines to rely on these more recent versions, as "[p]arties to a contract have no obligation to check the terms on a periodic basis to learn whether they have been changed by the other side." *Douglas*, 495 F.3d at 1066. In *Douglas*, the defendant revised its contract with an existing customer without providing notice of these revisions, which included, among other edits, an arbitration clause. *Id.* The court ultimately concluded that, by doing so, the defendant provided insufficient notice as to the new terms of the contract and, as a result, the court declined to compel arbitration. Similarly, Compass ensured that Veribi had sufficient notice of the terms of its July 2021 CHSA, including the arbitration provision, by requiring Veribi to review and assent to a scrollwrap agreement containing

these terms. Because Compass did not provide similar notice of the subsequent versions of the CHSA, the Court relies on the terms of the July 2021 CHSA.

Compass further argues that the scrollwrap agreement that Veribi assented to through its website in July 2021 indicated that the CHSA governed the entirety of the parties' relationship *with respect to the subject matter of the agreement*. MTCA Reply at 7–8. The July 2021 CHSA stated, in relevant part:

> This Compass Hosting Service Agreement (this "Agreement") **contains the terms and conditions that govern your access to and use of the Hosting Service (as defined below)** and is an agreement between Compass Mining Inc. ("Compass," "we," "us," or "our") and you or the entity you represent ("Customer," "you," or "your").
>
> **This Agreement constitutes the entire agreement between the parties with respect to the subject matter** of this Agreement, **and supersedes and replaces all prior or contemporaneous discussions, negotiations, proposals, understandings, and agreements, written or oral, as well as any industry custom**.

July 2021 CHSA at 1, 11 (emphasis added); *see also* ECF No. 15-3 ("Online CHSA"). The record establishes that Veribi was required to scroll through and accept the CHSA when purchasing cryptocurrency miners from Compass's website in July 2021. *See* July 2021 CHSA; Online CHSA. The Court finds that this scrollwrap agreement provided sufficient notice of the arbitration terms— even though the terms had been revised earlier that month—because the scrollwrap agreement affirmatively presented the terms of the CHSA, and as a result the new arbitration provision, directly to Veribi. This agreement governed Veribi's access to and use of Compass's services, and "supersede[d] and replace[d] all prior . . . agreements" entered into between Veribi and Compass *with respect to the subject matter of the agreement*. July 2021 CHSA at 11. The agreement also required as of July 2021 that all disputes arising under the agreement be resolved through mediation followed by arbitration. *Id.* at 10. Nor has Veribi demonstrated that the agreement is unconscionable. *See Blizzard*, 292 Cal. Rptr. 3d at 60 (noting that scrollwrap contracts "provid[e] the most" notice of all "wrap" agreements); *Berman*, 30 F.4th at 855–56 (concluding that "clickwrap" agreements, which conspicuously notify customers of their terms and require unambiguous consent, are valid and enforceable under California law).

/ / /

    4.   <u>Although Veribi was on notice of the July 2021 CHSA arbitration provision, the arbitration provision does not encompass Veribi's claims in this dispute.</u>

Veribi contends that the arbitration provision in the CHSA that it assented to through the website is only limited to the online transactions. MTCA Opp'n at 3–8.[7] Compass counters that the July 2021 CHSA governs the entirety of Veribi's hosting relationship with Compass, rather than a particular transaction. MTCA at 8–9.

The Ninth Circuit recently, in *Johnson v. Walmart*, considered a similar dispute and ultimately concluded that the defendant could not force a customer to arbitrate a dispute arising from an in-store purchase using an arbitration provision that the customer agreed to when he purchased items on the defendant's website. *Johnson v. Walmart Inc.*, 2023 U.S. App. LEXIS 511, at *11–12 (9th Cir. Jan. 10, 2023). Similar to the instant case, the plaintiff in *Johnson* purchased items from the defendant's website and, in doing so, entered into an agreement containing an arbitration provision. *Id.* at *4–5. The plaintiff separately purchased a service agreement in-person at one of the defendant's stores but did not consent to an arbitration agreement at the time he made the in-store purchase. *Id.* at *5, 9. The Ninth Circuit recognized that the plaintiff "contest[ed] the existence, not the scope, of an arbitration agreement that would encompass [his] dispute." *Id.* at *9. It reasoned that because the plaintiff's claim against the defendant concerning his in-store purchase of the service agreement did not arise out of the contract containing the arbitration agreement, but rather an entirely separate transaction at a physical store, then only if the service agreement itself is subject to the online agreement does an agreement to arbitrate claims arise out of that in-store purchase. *Id.* The Ninth Circuit further concluded that, viewing the online contract as a whole, the terms of use covered only access to and use of the defendant's websites. *Id.* at *10–11.

As in *Johnson*, Veribi contests the *existence*, not the scope, of an arbitration agreement encompassing its dispute involving the Russian miners. *Id.* at *9. Moreover, because Veribi's claims do not arise out of the July 2021 CHSA—the first CHSA containing an arbitration provision of

---

[7] Veribi argues that the Compass website's Terms of Service do not contain an arbitration clause. MTCA Opp'n at 10–11. However, as Compass points out, the website Terms of Service only "govern the use of Compass's website." MTCA Reply at 10. As a result, the Court finds that the website's Terms of Service are not at issue with respect to the instant motion.

which Veribi has proper notice—but rather an entirely separate agreement, then an agreement to arbitrate would only arise if the Russian miners at the center of this dispute are also subject to the July 2021 CHSA.  Here, the Court finds that they are not.

Because the existence of an arbitration agreement is at issue and the presumption in favor of arbitrability therefore does not apply, the Court looks to "general state-law principles of contract interpretation" to determine whether the parties have agreed to submit to arbitration.  In California, "[a] contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting." CAL. CIV. CODE § 1636. "To determine the reach of a particular agreement, we must look to its express terms." *Walsh v. Arizona Logistics, Inc.*, 998 F.3d 393, 396 (9th Cir. 2021). Under California law, a contract must be "interpreted as a whole." *Int'l Bhd. of Teamsters v. NASA Servs., Inc.*, 957 F.3d 1038, 1042 (9th Cir. 2020).

The merger clause of the July 2021 CHSA reads:

> 15.3 Entire Agreement.  This Agreement constitutes the entire agreement between the parties **with respect to the subject matter of this Agreement**, and supersedes and replaces all prior or contemporaneous discussions, negotiations, proposals, understandings, and agreements, written or oral, as well as any industry custom. Each party acknowledges that, in entering into this Agreement, it has not relied on, and shall have no right or remedy in respect of, any statement, representation, assurance or warranty other than as expressly set out in this Agreement. **Compass may at any time revise the terms of this Agreement by updating these terms and by providing notice to Customer of that change**.

July 2021 CHSA. Here, nothing in the July 2021 CHSA suggests that the "subject matter of this Agreement" is meant to encompass the entirety of Veribi and Compass's hosting relationship. Rather, the July 2021 CHSA was entered into in connection with the online purchase of particular miners; as a result,  "the subject matter" of the Agreement only concerns the parties' hosting relationship with respect to those miners purchased in the July 2021 online transaction—none of which were to be hosted in Russia.

During the hearing on this matter, counsel for Compass cited to a number of provisions within the July 2021 CHSA in support of its contention that the arbitration agreement governs the hosting of miners in Russia. Compass quoted the following provisions of the July 2021 CHSA:

> This Compass Hosting Service Agreement (this "Agreement") contains the terms and

> conditions that govern your access to and use of the Hosting Service.
>
> . . .
>
> The Parties agree that any dispute between or among them or their subsidiaries, affiliates or related entities arising out of, relating to or in connection with this Agreement, will be resolved.

July 2021 CHSA at 2, 10. However, Compass was unable to point to any language that would reasonably have led Veribi to understand that, at *any* Compass facility, the same terms would apply.[8]

Moreover, the Ninth Circuit has rejected the very same argument offered by Compass—that both purchases are "'merely interrelated contracts in an ongoing series of transactions,' such that the arbitration agreement of the first necessarily applies to the second." *Johnson*, 2023 U.S. App. LEXIS, at *12. The Court concluded that the two contracts were separate, independent agreements because the purchases were negotiated and entered into separately, involved separate consideration, and the proof required to establish the plaintiff's underlying claim did not involve his online purchase or the terms of the online agreement. *Id.* at *12–14. Here, Veribi entered into two separate, independent agreements when purchasing the Russian miners through direct invoices and when making its online purchase. The two transactions involved separate consideration, as the transaction in dispute was for the purchase of Russian miners, while the online transaction concerned miners housed at a different location. Finally, the proof required for Veribi to establish its underlying claims concerning the Russian miners involves neither a breach of the online agreement or an interpretation of the July 2021 CHSA.

Because the Court finds that the arbitration agreement in the July 2021 CHSA does not encompass disputes arising from Veribi's purchase of the Russian miners, the Court hereby DENIES the Motion to Compel Arbitration.[9]

///

///

---

[8] Compass refers to Section 14.4 of the July 2021 CHSA, which defines "Hosting Facility" as "a data center owned, leased, operated or reserved by Compass or Compass partners through the Site." July 2021 CHSA at 11. However, nowhere in the July 2021 CHSA is the term "Site" defined.

[9] The Court recognizes that Compass has filed a Motion to Dismiss. ECF No. 13. As discussed during the hearing, the Court will issue a separate order concerning the Motion to Dismiss.

### V.  **Conclusion**

For the foregoing reasons, the Court hereby ORDERS as follows:

1. The Court DENIES the Motion to Compel Arbitration (ECF No. 15);
2. The parties shall meet and confer and submit a joint statement, no later than seven (7) days from the date of this Order, indicating whether they would like the Court to hear oral argument on the pending Motion to Dismiss.

IT IS SO ORDERED.

Dated: January 20, 2023

_____
MAAME EWUSI-MENSAH FRIMPONG
United States District Judge