

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

VERIBI, LLC, a Nevada limited liability company,

Plaintiff,

v.

COMPASS MINING, INC., a Delaware corporation,

Defendant.

Case No.: 2:22-cv-04537-MEMF-JPR

**ORDER GRANTING IN PART DEFENDANT'S MOTION TO DISMISS [ECF NO. 13]**

Before the Court is the Motion to Dismiss (ECF No. 13) filed by Defendant Compass Mining, Inc. For the reasons provided below, the Court hereby GRANTS IN PART the Motion to Dismiss WITH LEAVE TO AMEND.

/ / /

/ / /

## I. Background

### A. Factual Background

The factual background necessary for resolution of this motion was thoroughly discussed in the Court's Order Denying the Motion to Compel Arbitration. ECF No. 39.

### B. Procedural History

On July 1, 2022, Veribi filed its Complaint against Compass, alleging: (1) breach of contract, (2) negligence, (3) conversion, and (4) fraud. *See generally* Complaint ("Compl.") ECF No. 1. On August 10, 2022, Compass filed the instant Motion to Dismiss and a Motion to Compel Arbitration. ECF Nos. 13 ("Mot."), 16. The Motion to Dismiss was fully briefed on September 1, 2022. ECF Nos. 27 ("Opp'n"), 32 ("Reply"). On November 17, 2022, the Court held oral argument on Compass's Motion to Compel Arbitration. The Court entered its Order Denying the Motion to Compel Arbitration on January 20, 2023. ECF No. 39. The Court held oral argument on the Motion to Dismiss on March 30, 2023.

## II. Applicable Law

### A. Rule 12(b)(6)

Under Federal Rule of Civil Procedure Rule 12(b)(6), a party may file a motion to dismiss for "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). The purpose of Rule 12(b)(6) is to "enable defendants to challenge the legal sufficiency of claims asserted in a complaint." *Rutman Wine Co. v. E. & J. Gallo Winery*, 829 F.2d 729, 738 (9th Cir. 1987). A district court may properly dismiss a claim under Rule 12(b)(6) if the complaint fails to allege sufficient facts to support a cognizable legal theory. *Caltex Plastics, Inc. v. Lockheed Martin Corp.*, 824 F.3d 1156, 1159 (9th Cir. 2016).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter . . . to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* While a complaint does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than "threadbare recitals

of the elements of a cause of action." *Id.* at 678. "Determining whether a complaint states a plausible claim for relief is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Ebner v. Fresh, Inc.*, 838 F.3d 958, 963 (9th Cir. 2016) (quoting *Iqbal*, 556 U.S. at 679).

When evaluating a complaint under Rule 12(b)(6), the court "must accept all well-pleaded material facts as true and draw all reasonable inferences in favor of the plaintiff." *Caltex*, 824 F.3d at 1159; *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008) ("We accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party."). This tenet, however, is "inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. Generally, a district court may not consider material beyond the pleadings in ruling on a Rule 12(b)(6) motion. *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001). Yet, a court may take judicial notice of "matters of public record." *Lee*, 250 F.3d at 689 (quoting *Mack v. South Bay Beer Distrib.*, 798 F.2d 1279, 1282 (9th Cir.1986)).

Federal Rule of Civil Procedure 15(a)(2) provides that a court "should freely give leave [to amend a pleading] when justice so requires." The Ninth Circuit has held that amendments should be granted with "extreme liberality" in order to "facilitate decision on the merits, rather than on the pleadings or technicalities." *United States v. Webb*, 655 F.2d 977, 979 (9th Cir. 1981). Accordingly, the burden of persuading the court that leave should not be granted rests with the nonmoving party. *See DCD Programs, Ltd. v. Leighton*, 833 F.2d 183, 186 (9th Cir. 1987). There are several factors a court may consider in deciding whether to grant leave to amend a complaint: (1) whether the plaintiff has previously amended his complaint, (2) undue delay, (3) bad faith, (4) prejudice to the opposing party; and (5) futility of amendment. *Loehr v. Ventura Cnty. Cmty. Coll. Dist.*, 743 F.2d 1310, 1319 (9th Cir. 1984).

**B. Rule 9(b)**

Claims grounded in fraud must satisfy "the heightened pleading requirements of Rule 9(b)." *Vess v. Ciba–Geigy Corp. USA*, 317 F.3d 1097, 1107 (9th Cir. 2003). Federal Rule of Civil Procedure 9(b) states that an allegation of "fraud or mistake must state with particularity the circumstances constituting fraud." FED. R. CIV. P. 9(b). Specifically, the "circumstances" required by

Rule 9(b) are the "who, what, when, where, and how" of the fraudulent activity. *Vess*, 317 F.3d at 1106; *Neubronner v. Milken*, 6 F.3d 666, 672 (9th Cir. 1993) ("[Rule 9(b) requires] the times, dates, places, benefits received, and other details of the alleged fraudulent activity."). Additionally, the allegation "must set forth what is false or misleading about a statement, and why it is false." *Vess*, 317 F.3d at 1106 (quoting *In re Glenfed, Inc. Secs. Litig.*, 42 F.3d 1541, 1548 (9th Cir. 1994)). Rule 9(b)'s heightened pleading standard applies not only to federal claims, but also to state law claims brought in federal court. *Id.* at 1103.

### C. Choice of Law

"A federal court sitting in diversity must look to the forum state's choice of law rules to determine the controlling substantive law." *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1187 (9th Cir. 2011). To determine whether Delaware law is applicable, California courts consider: "(1) whether the chosen state has a substantial relationship to the parties or their transaction, or (2) whether there is any other reasonable basis for the parties' choice of law." *Nedlloyd Lines B.V. v. Super. Ct.*, 834 P.2d 1148, 1152 (Cal. 1992). If neither of the two tests are met, the inquiry ends. *Id.* A substantial relationship between the choice of law state and the contracting parties exists if a party is domiciled in the state. *Id.* at 467. Moreover, a "reasonable basis" for following a choice of law provision exists if one of the parties resides in the state. *Id.*

## III. <u>Discussion</u>

Compass argues that Veribi's Complaint should be dismissed because (1) Delaware law governs this dispute, and (2) Veribi fails to state any claim upon which relief can be granted. Mot. at 4–16. Veribi asserts that (1) California law applies to this action and (2) each of its claims have been properly pled. *See generally* Opp'n.

/ / /

/ / /

/ / /

### A. California law governs this dispute because the parties' relationship is not governed by the Compass Hosting Service Agreements.[1]

Compass contends that Delaware law governs all claims in this dispute because (1) the parties' relationship is governed by the Compass Hosting Service Agreements ("CHSAs"), (2) the CHSAs contain a binding Delaware choice of law provision, and (3) the provision is sufficiently broad to encompass all of Veribi's claims. Mot. at 4–5. Veribi argues that (1) California law applies to this action and (2) the CHSAs do not apply to this action and cannot be considered on a Motion to Dismiss. Opp'n at 4–5. The Court applies California law to the question of choice of law. The parties appear to agree that the choice of law depends on whether the CHSAs apply. As described below, the Court finds that the CHSAs do not govern the parties' relationship for purpose of Veribi's breach of contract claim.

#### i. Veribi's breach of contract claim relies on contracts separate from the CHSAs.[2]

First, Veribi's breach of contract claim is explicitly premised on the contracts entered into by the parties at the time they contracted for services concerning the Russian miners, and not the CHSAs, which were entered into later. Compl. ¶¶ 16–17; Declaration of Thomas Heller, ECF No. 13-1, ("Heller Decl.") ¶¶ 5–10.[3] *See* Opp'n at 5–6. Specifically, Veribi alleges in its Complaint that

---

[1] As the Court discussed in its prior Order Denying the Motion to Compel Arbitration, throughout the parties' briefing, they refer to three different agreements: the Compass Mining Hosting Terms and Conditions, Compass Hosting Services Agreement, and Master Compass Hosting Service Agreement. During the hearing on the Motion to Compel Arbitration, the parties confirmed that all three of these are different names for the same document. The Court will hereinafter refer to this agreement as the Compass Hosting Services Agreement ("CHSA"). There are multiple iterations of the CHSA, including the three containing arbitration provisions, dated July 2021, August 2021, and January 2022.

[2] Though the Court may—and does—take judicial notice of the CHSAs, a question still exists to whether the CHSA applies to the claims at issue. The Court finds that they do not apply.

[3] Compass's Motion includes attachments consisting of different versions of the CHSA, which they allege are the basis of Veribi's Complaint. Supplemental Declaration of Thomas Heller, ECF No. 32-1 ("Heller Supp. Decl.") ¶ 3–8. The earliest version of the CHSA provides in relevant part:

> This Agreement and all claims arising out of or related to this Agreement are **governed by and construed in accordance with the laws of the State of Delaware without giving effect to any choice or conflict of law provision or rule that would cause the application of the laws of any jurisdiction other than the State of Delaware**. The jurisdiction is exclusively to the courts within the State of Delaware.

Veribi purchased miners from Compass via email communications, texts, Telegram[4] messages, and phone conversations followed by a representative invoice with relevant terms. Compl. ¶ 17. Thus, assuming Veribi's allegations as true, the Court finds that the CHSAs do not govern the parties' relationship.

ii. The CHSAs are not valid contracts under California law.

Furthermore, as the Court previously held in its Order Denying MTCA, Compass has failed to show that the CHSAs even formed a valid contract between the parties. *See generally* Order Denying MTCA. Mutual assent is required for contract formation, and, as this Court found, mutual assent was lacking: Compass failed to provide reasonably conspicuous notice of the CHSA and its revised terms. ECF No. 39 at 9-13; *see Knutson v. Sirius XM Radio Inc.*, 771 F.3d 559, 565 (9th Cir. 2014) (holding that California law requires mutual assent for contract formation); *Stover v. Experian Holdings, Inc.*, 978 F.3d 1082, 1086 (9th Cir. 2020) (holding that under California law, for "changes in terms to be binding pursuant to a change-of-terms provision in the original contract, both parties to the contract – not just the drafting party – must have notice of the change in contract terms."). Thus, the Court finds that the CHSAs are not valid contracts under California law and for this additional reason do not govern the parties' relationship. As a result, Delaware law does not apply to this Motion to Dismiss.[5]

---

ECF No. 13-3, Ex. B ("June 2021 CHSA") at 12 (emphasis added). The subsequently revised versions of the CHSA, dated July 6, 2021, July 9, 2021, and August 2, 2021, contain substantially the same governing law general provision as the June 2021 CHSA. However, the CHSA dated January 12, 2022, states as follows:

> This Agreement and all claims arising out of or related to this Agreement are governed by and construed in accordance with the laws of the State of Delaware without giving effect to any choice or conflict of law provision or rule that would cause the application of the laws of any jurisdiction other than the State of Delaware. **Subject to Section 8**, the jurisdiction is exclusively to the courts within the State of Delaware **and Customer irrevocably waives any objection to such jurisdiction and venue**.

ECF No. 13-7, Ex. F ("January 2022 CHSA") at 23 (emphasis added).

[4] Telegram is an encrypted messaging application that is popular in Russia and Eastern Europe. Compl. at 5 n.1.

[5] Because the Court finds that the CHSA does not apply, it need not consider Compass's remaining arguments as to whether the CHSA contains a binding Delaware choice of law provision and whether the provision is sufficiently broad to encompass all of Veribi's claims.

**B. Veribi's breach of contract claim is sufficiently pled and Veribi is not barred from the relief it seeks.**

Compass seeks dismissal of Veribi's claim for breach of contract because—even assuming the truth of the allegations: (1) the force majeure and limitation of liability provisions in the CHSAs preclude relief; and (2) the common law impossibility doctrine bars Veribi's claim. Mot. at 8–13.[6]

i. Because the CHSAs do not apply to Veribi's breach of contract claim, the force majeure and limitation of liability provisions in those agreements do not preclude relief.

Compass argues that the force majeure and limitation of liability provisions[7] in the CHSAs preclude Veribi's claims and warrant dismissal. As discussed above, this Court finds that the CHSAs do not govern Veribi's breach of contract claim. The Court therefore DECLINES to dismiss the claim on these grounds.

ii. The common law impossibility doctrine does not bar Veribi's breach of contract claim.

Compass further contends that the common law impossibility doctrine precludes Veribi's breach of contract claim.

Once BitRiver was placed on OFAC's sanctioned entities list in April 2022,any contact Compass had with BitRiver seeking BitRiver's services would haveconstituted a federal crime.

According to Compass, Executive Order 14024 imposed sanctions that made it impossible for Compass to perform its duties under the relevant contract without violating the law. Mot. at 12–13; Reply at 7. Veribi argues that Executive Order 14024 did not prohibit parties from demanding return of their lawful property and terminating existing relations with a sanctioned entity. Opp'n at 8.

Although impossibility is typically an affirmative defense, and therefore may not ordinarily be raised on a motion to dismiss, a court can consider an affirmative defense on a motion to dismiss

---

[6] The Court takes judicial notice of the Executive Order 14024 issued by the President of the United States and both parties cite to it in support of their respective positions.

[7] Compass contends that the sanctions and related acts of war giving rise to this dispute were a force majeure event relieving Compass of its contractual obligations because the CHSAs included a force majeure provision. Mot. at 8. Compass further contends that Veribi's ability to recover the harm alleged in its Complaint is barred because the CHSAs included a limitation of liability provision. *Id.* at 13. As discussed above, the CHSAs do not apply.

when there is an "obvious bar to securing relief." *U.S. Commodity Futures Trading Comm'n v. Monex Credit Co.*, 931 F.3d 966, 972 (9th Cir. 2019) (quoting *ASARCO, LLC v. Union Pac. R.R. Co.*, 765 F.3d 999, 1004 (9th Cir. 2014)).

Compass argues that when Executive Order 14024 designated its partner BitRiver as a sanctioned entity, any type of contact with BitRiver regarding its services is in violation of the law. Mot. at 13 ("Once BitRiver was placed on OFAC's sanctioned entities list in April 2022 ,any contact Compass had with BitRiver seeking BitRiver's services would have constituted a federal crime.").

In response, Veribi contends that purpose of Executive Order 14024 was to institute economic sanctions against Russia, to prevent actions *for the benefit of* any sanctioned entity, and to prohibit "the receipt of any contribution or provision of funds, goods, or services" from sanctioned entity. 31 C.F.R. § Pt. 587, App. A (emphasis added). Thus, according to Veribi, Compass's abandonment of Veribi's miners within BitRiver's possession actually contradicted the purpose of the sanctions and "further[s] a result inconsistent with the purpose of the Executive Order." *Bassidji*, 413 F.3d at 935.

Veribi also argues that, even assuming transfer of the miners was prohibited by the Executive Order, there were other actions Compass could have taken in furtherance of its obligations—short of simply effectuating a transfer of the miners—that undisputably would not have been illegal. These include (1) communicating to BitRiver that Veribi—not Compass—owned the miners, Opp'n at 8-9; (2) "filing a declaratory judgment action against the Office of Foreign Asset Control (OFAC) to determine how best to proceed for [Veribi's] customers," Opp'n at 3; or (3) as discussed at the hearing, seeking a license from the Department of Treasury to permit transfer of the miners. Taking all allegations in the complaint as true, and drawing all reasonable inferences in favor of Veribi, Compass failed to communicate to BitRiver that Veribi—not Compass—owned the miners, and this prevented Veribi from taking its own action to retrieve the miners. Compl. *See* Complaint at ¶¶ 26-27, 31 ("Compass . . . has failed to protect [its customers'] interests, likely as a result of subterfuge and misrepresentation regarding the actual nature of its relationship with BitRiver, including apparent misrepresentations to BitRiver regarding the actual ownership of its customers' miners."), Ex. I, Ex. J. And according to Veribi, such communication clarifying the ownership of the miners

would have been *permitted* by the governing regulations. Opp'n at 9 (citing to 31 C.F.R. § 589.214 ("Personal communications. The prohibitions contained in this part do not apply to any postal, telegraphic, telephonic, or other personal communication that does not involve the transfer of anything of value.")). It is at least arguable that this is true, and on a Motion to Dismiss, the Court need not resolve this question. Similarly, it appears plausible that the Executive Order would not prohibit a declaratory judgment action or an application for a license. Therefore, Compass has not established at this stage that its affirmative defense of impossibility is an "obvious bar to securing relief." *Monex Credit Co.*, 931 F.3d at 973. For these reasons, the Court DECLINES to grant the Motion on this ground.[8]

**C. Veribi's tort claims are not barred by the economic loss rule.**

Compass seeks dismissal of Veribi's tort claims for negligence, conversion, and fraud because Veribi failed to allege that Compass breached a duty that is independent of duties imposed by the contracts. Mot. at 14. Veribi contends that its claims are based on duties independent of the contracts. Opp'n at 10.

Economic loss rule "prevents the erosion of contract doctrines by use of tort law to work around them." *Sheen v. Wells Fargo Bank, N.A.*, 505 P.3d 625, 633 (Cal. 2022). Recovery of purely economic loss is foreclosed in the absence of (1) personal injury, (2) physical damage to property, (3) a "special relationship" existing between the parties, or (4) some other common law exception to the rule. *See J'Aire Corp. v. Gregory*, 598 P.2d 60, 62–63 (Cal. 1979). Tort damages are permitted in contract cases when "the duty that gives rise to tort liability is either completely independent of the

[8] During the hearing on this Motion, Compass argued that the Ninth Circuit reversed a denial of a motion to dismiss a claim for breach of contract where an Executive Order similar to that in the instant case made compliance with the contract illegal. *See Bassidji v. Goe*, 413 F.3d 928 (9th Cir. 2005). In *Bassidji*, the Ninth Circuit concluded that the plain text of the Executive Order at issue explicitly prohibited the conduct required by the contract. Compass also cited to *Kashani v. Tsann Kuen China Enter. Co.* for the same proposition that the court cannot compel actions made illegal under federal law. In *Kashani*, the California Court of Appeal held that the "express purposes" of the agreement at issue "were to supply goods, technology, and services to Iran and even to sell products to the government of Iran," which violated the Executive Order imposing sanctions on Iran. However, the Court finds *Bassidji* and *Kashani* to be distinguishable because the language of Executive Order 14024 does not explicitly prohibit all of the relief that Veribi allegedly seeks from Compass, namely, the communication to BitRiver about ownership, the declaratory judgment action, or the application for a license.

contract or arises from conduct which is both intentional and intended to harm." *Sheen*, 505 P.3d at 633.

Veribi argues that it properly alleged a special relationship between the parties that would bar application of the economic loss rule. Specifically, Veribi argues it has alleged that (1) between May 2021 and January 2022, Veribi and Compass completed multiple transactions which involved Compass managing Veribi's miners at a facility in Russia, in which Compass agreed to act as Veribi's agent with respect to its bitcoin mining systems, and (2) generally, an agent is a fiduciary. Compl. ¶ 44. Compass argues that Veribi's use of agency and fiduciary language in setting forth its tort claims does not change the substance of its allegations. Mot. at 15.

The Court finds, however, that Veribi has properly alleged a fiduciary relationship. "It is well settled that a fiduciary relationship may be created in a wide variety of circumstances" and is not limited to a group of relationships. *Breach of fiduciary relationship*, 26 Williston on Contracts § 69:23 (4th ed. 2022). A court must carefully distinguish between "arms-length commercial relationships where trust is created" and relationships in which the "[plaintiff's] trust is based on defendant's position in the transaction." *United States v. Milovanovic*, 678 F.3d 713, 722 (9th Cir. 2012). According to the Ninth Circuit, "[t]he very meaning of being an agent is assuming fiduciary duties to one's principal." *Chem. Bank v. Sec. Pac. Nat'l Bank*, 20 F.3d 375, 377 (9th Cir. 1994). Here, Veribi alleges that it has paid over $1.5 million dollars for miners and that, throughout the duration of the relationship, Compass managed and hosted such miners in facilities beyond Veribi's control. Compl. ¶ 16. Veribi's Complaint is replete with allegations of Compass's role as an agent. *See, e.g.*, Compl. ¶¶ 31 ("Compass is its customers' agent with regard to their mining systems . . . ."); 35 ("Compass is Veribi's agent with respect to the operation and management of Veribi's bitcoin mining systems."); 44 ("In agreeing to manage Veribi's bitcoin mining systems in exchange for payment, Compass Mining agreed to act [as] Veribi's agent with respect to its bitcoin mining systems. Generally, an agent is a fiduciary . . . ."); 45 ("As Veribi's agent, Compass accepted certain duties with respect to Veribi's bitcoin mining systems . . . ."); 63 ("Veribi was induced . . . to appoint Compass as its agent, and to entrust Compass with the operation and management of the miners at BitRiver's facilities in Russia."). Although the contracts themselves do not indicate a

fiduciary relationship, the relationship between Veribi and Compass is akin to a "trusting relationship in which one party acts for the benefit of another." *Milovanovic*, 678 F.3d at 724. In exchange for Veribi's performance of paying $1.5 million dollars, Compass was obligated to "act for the benefit" of Veribi by managing and hosting its miners in facilities. Thus, the Court finds that the economic loss rule does not apply, and Veribi's Complaint sufficiently alleged an independent duty giving rise to tort liability. For these reasons, the Court DECLINES to grant the Motion on this ground.

**D. Veribi sufficiently pleaded its conversion claim.**

Compass seeks dismissal of Veribi's claim for conversion because it fails to allege Compass's dominion and/or control over the miners. Reply at 9. Veribi counters that conversion only requires a showing of an assumption of control or ownership over the property. Opp'n at 12.

Under California law, the elements for conversion are "(1) the plaintiff's ownership or right to possession of personal property; (2) defendant's disposition of the property in a manner that is inconsistent with the plaintiff's property rights; and (3) resulting damages." *Fremont Indemnity Co. v. Fremont General Corp.*, 55 Cal. Rptr. 3d 621, 638 (Ct. App. 2007) (quoting *Burlesci v. Petersen*, 80 Cal. Rptr. 2d 704 (Ct. App. 1998)). A manual taking of the property is not necessary, only that an assumption of control or ownership over the property, or that the alleged converter has applied the property to his or her own use. *Prakashpalan v. Engstrom, Lipscomb & Lack*, 167 Cal. Rptr. 3d 832, 857 (Ct. App. 2014).

The parties dispute only the second element of conversion—whether defendants disposed of the property in a manner that is inconsistent with the plaintiff's property rights. Veribi's Complaint contains the following allegations regarding its claim for conversion:

49. **Veribi entered into various Agreements for with Compass to purchase bitcoin mining systems and management services from Compass** for over $1.5 million dollars.
50. Veribi **agreed to have the servers it purchased from Compass hosted in Russia** with Compass' partner, BitRiver.
51. On or about April 21, 2022, **Compass ceased managing Veribi's bitcoin mining servers and, on information and belief, abandoned them** with BitRiver in Russia.
52. Compass has **failed to effect or even take reasonable steps to effect the lawful removal or sale of the miners**, as through a lawsuit in Russia, or the U.S., or

otherwise cooperate with Veribi to sell, transfer, or repatriate Veribi's bitcoin mining servers hosted by BitRiver.

53. Compass' acts constitute conversion of Veribi's property in favor of BitRiver. On information and belief, such conversion was undertaken due to an undisclosed financial relationship between Compass and BitRiver, or because Compass was not able to pay BitRiver on behalf of its customers, or because Compass improperly held or registered the equipment under names other than those of its customers for tax, duty, or for other reasons, or some other reason that would not justify Compass' failure to secure the property.

54. As a result of the conversion of its goods, Veribi's has been **damaged in an amount not less than $1,523,500,** reflecting the retail value of the converted goods.

55. Veribi's has **also suffered consequential damages**, including loss of expected profit from their operation, time and efforts of agents and employees to investigate and address the matter, interest, legal fees, and other damages.

Compl. ¶¶ 49–55 (emphasis added). First, Veribi alleged that it purchased the miners from Compass and are the rightful owners. *Id.* ¶ 16. Next, Compass's conduct was inconsistent with the parties' agreement and Veribi's property rights when it ceased management and left Veribi's miners with its former partner, BitRiver. As the parties agreed, Compass was to control the miners on behalf of Veribi since it was charged with managing the miners at its partner's hosting facilities. *Id.* ¶ 16–17. When Veribi attempted to retrieve its miners, BitRiver told Veribi that its miners were owned by Compass and only Compass can take action to secure the property from BitRiver. *Id.* ¶ 26. Thus, Veribi's Complaint alleged that Compass "assumed control" of its miners pursuant to its "deal" with BitRiver and inconsistent with Veribi's property rights.[9] *Prakashpalan*, 167 Cal. Rptr. 3d at 857;

---

[9] During the hearing on this Motion, Compass argued that the conversion claims also fail for lack of "affirmative action." Compass cited to *Archer v. Coinbase, Inc.*, 267 Cal. Rptr. 3d 510 (Ct. App. 2020) and *Spates v. Dameron Hospital Assn.*, 7 Cal. Rptr. 3d 597 (Ct. App. 2003) in support of the proposition that conversion requires some "affirmative action to exercise dominion over or deprive a plaintiff of his or her property." *See Archer*, 267 Cal. Rptr. 3d at 518 (citing *Spates*, 7 Cal. Rptr. 3d at 609).

However, these cases do not support dismissing Veribi's claim at this stage. First, both of these cases were decided at the summary judgment stage. Because this is motion to dismiss, the Court must construe the Complaint in the light most favorable to plaintiff, and it accepts all the allegations in the Complaint as true. *Manzarek*, 519 F.3d at 1031. This is in contrast to the *evidence* that may be presented at the summary judgment stage. *See e.g.*, Archer, 53 Cal. App. 5th at 276 ("In support of its summary judgment motion, Coinbase submitted *evidence* it had not taken any affirmative action with respect to Bitcoin Gold . . . . Though plaintiff "disputed" those statements, he provided no admissible *evidence* to contradict them . . . ." (emphasis added)).

*Fremont Indemnity*, 55 Cal. Rptr. 3d at 638. Third, due to Compass's conduct, Veribi alleged damages of over $1.5 million dollars. Compl. ¶ 54. Thus, the Court finds that Veribi has sufficiently pleaded its claim for conversion, and DECLINES to grant the motion on this ground.

### E. Veribi failed to meet the heightened pleading standard for its fraud claim, but should be granted leave to amend.

Compass seeks dismissal of Veribi's claim for fraud because Veribi does not sufficiently plead its claim with particularity. Mot. at 16.

The elements for a cause of action for fraud in California are: "(a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or 'scienter'); (c) intent to defraud, i.e. to induce reliance; (d) justifiable reliance; and (e) resulting damage." *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1126 (9th Cir. 2009) (quoting *Engalla v. Permanente Med. Group, Inc.*, 938 P.2d 903 (Cal. 1997). Justifiable reliance requires a plaintiff to establish actual reliance which occurs when a misrepresentation is "an immediate cause of [a plaintiff's] conduct, which alters his legal relations, and when absent such representation, [plaintiff] would not, in all reasonable probability, have entered into the contract or other transaction. *Engalla*, 938 P.2d at 919 (quoting *Spinks v. Clark*, 82 P. 45, 47 (Cal. 1905)). Further, the plaintiff need only show that the

---

Second, unlike the defendants in *Archer* and *Spates*, and according to the allegations in the complaint, Compass *did* take some affirmative action. In *Archer,* the court held that the plaintiff's conversion claim was deficient because the undisputed facts were that the plaintiff merely failed to take action to allow plaintiff to access his property which was in the possession of a third party. The court held "conversion requires affirmative action to deprive another of property, not a lack of action." *Archer*, 267 Cal. Rptr. 3d at 518. Similarly, in *Spates*, the court affirmed a grant of summary judgment on the plaintiff's conversion claim even where defendant failed to return property to plaintiff or provide notice of abandonment of the property. The *Spates* court concluded that defendant's failure to take further steps to provide notification to the plaintiff regarding the property was not an affirmative action sufficient to constitute conversion. *Spates*, 7 Cal. Rptr. 3d at 609. Here, Veribi alleges that at the very least Compass entered into a "deal" with BitRiver other than a simple agent-provider relationship and then misrepresented to BitRiver the true ownership of the miners, Compl. ¶ 31, "whether to avoid tax, import, or other duties or obligations, or because of the manner in which its deal with BitRiver is structured." Compl. ¶ 29; *see also* Compl. ¶ 51 ("such conversion was undertaken due to an undisclosed financial relationship between Compass and BitRiver, or because Compass was not able to pay BitRiver on behalf of its customers, or because Compass improperly held or registered the equipment under names other than those of its customers for tax, duty, or other reasons, or some other reason.") According to the Complaint, this prevented Veribi from retrieving the miners itself as it allowed BitRiver to claim that they were Compass's property. Compl ¶¶ 26-28. The Court therefore finds these cases unavailing.

misrepresentations were material, and that a "reasonable trier of fact could infer reliance from such misrepresentations." *Id.*

Veribi's Complaint contains the following allegations regarding its claim for fraud:

> 57. **Compass has engaged in fraudulent misrepresentations or concealment regarding** (1) its alleged secure and competent management of its Customers' miners in conformity with governing laws and regulations; (2) the safety, security, and reliability of its operations in Russia; (3) the actual nature of its relationship with BitRiver AG and its affiliated companies; (4) its alleged inability to facilitate the removal of customer miners from BitRiver's facilities due to U.S. Sanctions; (5) its lack of significant efforts to sell, transfer, or repatriate customers' miners; (6) its unwillingness or inability to facilitate or permit the sale of customer miners in Russia to non-U.S. third parties; (7) and its compliance with relevant regulations concerning ownership, import, and/or tax status of customer miners under its management and control, with the failure of such compliance being in part responsible for Compass' inability to transfer or repatriate Russian miners sold to its customers, including Veribi.
>
> 58. Specifically, on **March 4, 2022, Whit Gibb, Compass' CEO**, wrote falsely that, "At this time it is 'business as usual', and there is no reason to be worried….Again, at this time there is no cause for concern. I am in constant communication with our Russian hosting partner, who also sits on the Russian Government's Crypto Working committee**. If the situation changes, Compass will take swift action to move all machines out of Russia** immediately but at this time drastic action is not needed." The **situation changed, and Compass did not take swift, much less drastic, action to facilitate the removal** of its customers' miners from BitRiver's facility. Instead, it cancelled its contract with BitRiver and abandoned its customers.
>
> 59. Compass has repeatedly falsely represented to its customers that, pursuant to BitRiver's designation as a sanctioned entity on April 21, 2022, it is prohibited from engaging in "business dealings" with BitRiver and its affiliated companies, including the removal or transfer of its customers' miners, and therefore that Compass was legally obligated to terminate its relationship with BitRiver without securing custody of its customers' miners. This is a false representation of the scope and consequences of Executive Order 14024 made to customers who entrusted Compass as their agent with the custody and control of their miners.
>
> 60. Instead of abandoning its customers' property with BitRiver, Compass had and has an obligation to act in its customers' best interest to secure their property in any practicable manner consistent with Executive Order 14024. To date, Compass has not even filed suit in the U.S. or Russia or taken other significant steps to secure the release of its customers' miners from BitRiver's facilities.
>
> 61. Compass has held itself out as a partner contracting for secure and reliable hosting with BitRiver, including stating that, "BitRiver has long been a trusted name in the bitcoin mining industry, we are pleased to call them our exclusive hosting partner in Russia,' said Whit Gibbs, CEO and Founder of HASHR8. 'We are excited to help more Compass users host their ASICs in BitRiver's world-class facilities.'" **On information and belief, Compass' relationship with BitRiver was other than as a contracted provider of datacenter hosting services, such that the actual nature of the relationship involved financial entanglements or**

> **misrepresentations that rendered Compass' customers' vulnerable to potential sanctions on BitRiver**, including that Compass might abandon their property if BitRiver were designated as a sanctioned entity.
>
> 62. By selling bitcoin mining systems and hosting services to its customers, Compass was **warranting that its customers were the actual owners of the purchased systems** and that sale, import, tax, and operation of the miners would conform with existing local laws and regulations governing miners in foreign facilities. On information and belief, Compass failed to adhere existing local laws and regulations covering the ownership, sale, import, tax, and operation of the miners hosted at BitRiver's facilities, and concealed this failure, rendering it incapable of facilitating the sale or transfer of its customers' miners from BitRiver's facilities after BitRiver was subjected to U.S. sanctions.
>
> 63. In **reliance of Compass' false representations and omissions of material fact, as detailed above and in the body of this Complaint, John Vanhara of Veribi was induced to purchase and continue hosting over 1.5 million dollars worth of bitcoin mining systems with Compass**, to appoint Compass as its agent, and to entrust Compass with the operation and management of the miners at BitRiver's facilities in Russia.
>
> 64. As a **result of relying on Compass' false representations, omissions of material fact, and failure to act in customers' best interest, Veribi has been damaged in an amount not less than $1,523,500**, reflecting the retail value of its abandoned property.
>
> 65. Veribi's has also suffered consequential damages, including loss of expected profit from the operation of its miners, time and efforts of agents and employees to investigate and address the matter, interest, legal fees, and other damages. Punitive damages and attorneys' fees are warranted because Compass' misrepresentations and calculated omissions were willful, wanton, and oppressive to those who entrusted it to protect their property and promote their interests.

Compl. ¶¶ 57–65 (emphasis added).

Compass contends that Veribi has not properly alleged: (1) misrepresentation; (2) knowledge of falsity; (3) intent to defraud; and (4) justifiable reliance.

First, Compass argues that Veribi failed to allege with specificity as required by Rule 9(b), omitting the "who, when, and where." Mot. at 18. Veribi counters that its fraud claim is adequately pled as it provided Compass with notice of the nature and details of the claims against it. Opp'n at 13. However, it appears that Veribi's Complaint alleges the "who," "where," and "when" as to Compass's CEO, Whit Gibbs, who made the fraudulent misrepresentation via an online message board on March 4, 2022. Compl. ¶¶ 57–58; Ex. F (ECF No. 1-1). Although Compass argues that the March 4, 2022 statement by Gibbs cannot support Veribi's fraud claim, Rule 9(b) only demands that the allegations "be specific enough to give defendants notice of the particular misconduct . . . so that

they can defend against the charge and not just deny that they have done anything wrong." *Vess*, 317 F.3d at 1106. Thus, the Court finds that Veribi has sufficiently alleged the first element of fraud.

With respect to the second and third elements of fraud—knowledge of falsity or intent to defraud or induce reliance—the Court finds that Veribi failed to meet the heightened pleading standard under FED. R. CIV. P. 9(b). As an initial matter, Veribi fails to allege with particularity Compass's knowledge of the falsity or intent to provide the false statements. Nor does Veribi's Opposition explain how Compass had knowledge or intent to provide the false statements. Thus, the Court finds that Veribi's allegations do not satisfy the second and third element of fraud, and do not meet the heightened pleading standard under Rule 9(b). In light of the Court's conclusion that Veribi's Complaint is deficient as to the second and third elements of fraud, the Court need not consider whether Veribi's fraud claim properly pleads justifiable reliance.

Although Compass requests dismissal of Veribi's fraud claim without leave to amend, a district court should generally grant leave to amend freely. *Cervantes v. Countrywide Home Loans, Inc.*, 656 F.3d 1034, 1041 (9th Cir. 2011). The Court finds that the absence of bad faith, undue delay, prejudice to the opposing party, futility of the amendment, and Veribi's prior attempts to amend its complaint all weigh in favor of allowing amendment. First, Veribi has not previously amended its complaint. Second, allowing amendment will not cause undue delay as the action is still at the pleadings stage. Third, there is no indication that Veribi acted in bad faith. Fourth, there is no indication that leave to amend will prejudice Compass. Compass has not indicated how allowing Veribi to include additional information in an amended complaint would prejudice it in this action. Lastly, the Court finds that amendment would not be futile as an amended complaint could introduce more detailed factual allegations for the Court to consider. Accordingly, the Court GRANTS Compass's Motion to Dismiss as to Veribi's fraud claim with LEAVE TO AMEND.

/ / /

/ / /

/ / /

## CONCLUSION

For the foregoing reasons, the Court hereby ORDERS as follows:

1. The Court DENIES the Motion to Dismiss as to Veribi's claims for breach of contract, negligence, and conversion;
2. The Court GRANTS the Motion to Dismiss as to Veribi's claim for fraud with LEAVE TO AMEND; and
3. Veribi is ORDERED to file a First Amended Complaint within twenty-eight (28) days of the date of this Order if they still desire to pursue any of the claims being dismissed with leave to amend.

IT IS SO ORDERED.

Dated: April 20, 2023

MAAME EWUSI-MENSAH FRIMPONG
United States District Judge